**RELIGIOUS TECHNOLOGY CENTER, a California non-profit corporation; and Bridge Publications, Inc., a California non-profit corporation, Plaintiffs,**

v.

**NETCOM ON–LINE COMMUNICATION SERVICES, INC., a Delaware corporation; Dennis Erlich, an individual; and Tom Klemesrud, an individual, dba Clearwood Data Services, Defendants.**

No. C–95–20091 RMW.

United States District Court,
N.D. California.

Sept. 22, 1995.

Helena K. Kobrin, North Hollywood, CA, Andrew H. Wilson, Wilson, Ryan & Campilongo, San Francisco, CA, Thomas M. Small, Janet A. Kobrin, Small, Larkin & Kiddé, Los Angeles, CA, Elliot J. Abelson, Los Angeles, CA, for Plaintiffs.

Randolf J. Rice, Pillsbury, Madison & Sutro, San Jose, CA, for Defendant Netcom On–Line Communication Services.

Harold J. McElhinny, Carla Oakley, Morrison & Foerster, San Francisco, CA, for Defendant Dennis Erlich.

Daniel Leipold, Hagenbaugh & Murphy, Orange, CA, for Defendant Tom Klemesrud.

**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' APPLICATION FOR A PRELIMINARY INJUNCTION AND DEFENDANT ERLICH'S MOTION TO DISSOLVE THE TRO; DENYING PLAINTIFFS' APPLICATION TO EXPAND THE TRO; DENYING PLAINTIFFS' MOTION FOR CONTEMPT; GRANTING ERLICH'S MOTION TO VACATE THE WRIT OF SEIZURE; AND DENYING PLAINTIFFS' REQUEST FOR SANCTIONS AGAINST ERLICH'S COUNSEL**

WHYTE, District Judge.

This case involves the scope of intellectual property rights on the Internet.[1] Plaintiffs, two Scientology-affiliated organizations claiming copyright and trade secret protection for the writings of the Church's founder, L. Ron Hubbard, brought this suit against defendant Dennis Erlich ("Erlich"), a former Scientology minister turned vocal critic of the Church, who allegedly put plaintiffs' protected works onto the Internet.[2]

On June 23, 1995, this court heard the parties' arguments on eight motions, five of which relate to Erlich and are discussed herein: (1) plaintiffs' motion for a preliminary injunction against Erlich and Erlich's related motion to dissolve or amend the Amended TRO; (2) plaintiffs' application to expand the TRO; (3) plaintiffs' motion for contempt against Erlich; (4) Erlich's motion to vacate the writ of seizure; and (5) and plaintiffs' request for sanctions against Erlich's counsel.[3] For the reasons set forth below, the court grants in part and denies in part plaintiffs' motion for a preliminary injunction against Erlich and Erlich's motion to dissolve the TRO, denies plaintiffs' application to expand the TRO, denies plaintiffs' motion for contempt against Erlich, grants Erlich's motion to vacate the writ of seizure, and denies plaintiffs' request for sanctions against Erlich's counsel.

**I. BACKGROUND**

Defendant Dennis Erlich was a member of the Church of Scientology ("the Church")[4]

---

1. The Internet is a world-wide network of networks, made up of approximately 7 million computers interconnected through 60,000 networks, all sharing a common communications technology. Anthony M. Rutkowski, *Federal News Service*, July 27, 1995. It is decentralized in that there is no central hub through which information must be routed and no central governing body. *United States v. Baker*, 890 F.Supp. 1375 at 1379 n. 1 (E.D.Mich.1995). Started as a project by the Department of Defense, the Internet has expanded to include universities, government agencies, and commercial enterprises. There are currently over 25 million users worldwide accessing the Internet, and the numbers are doubling every year. *MTV Networks v. Curry*, 867 F.Supp. 202, 203 n. 1 (S.D.N.Y.1994). Users of the Internet can access such services as e-mail, Usenet newsgroups, file exchanges, and the "World Wide Web," a distributed hypertext information service, accessed using a "Web browser." *Guardian*, Sept. 1, 1994, at T8.

2. Plaintiffs additionally sued defendants Tom Klemesrud ("Klemesrud"), who operates the bulletin board service ("BBS") used by Erlich, and Netcom On–Line Communication Services, Inc. ("Netcom"), who provides that BBS with access to the Internet.

3. The court will address plaintiffs' motion for a preliminary injunction against Klemesrud and Netcom, Klemesrud's motion for judgment on the pleadings, and Netcom's motion for summary judgment in a separate order.

4. Plaintiffs describe the works of the "Scientology Religion" as "applied religious philosophy and spiritual healing technology." First Am. Compl. ("FAC") ¶ 9. The Ninth Circuit described the Church's teachings as follows:

> The Church ... teaches that a person's behavior and well-being are improved by removing "engrams" from the unconscious mind. Engrams are impressions recorded by the unconscious mind in times of trauma in this life or in previous lives. Engrams return in moments of similar stress to the detriment of the person's behavior. Removing engrams from the unconscious permits the person's analytical mind to function unhindered.
>
> Engrams are located and purged through "auditing." Auditing uses the "technology" and "advanced technology" of the Church.... The adherent must proceed through a series of increasingly sophisticated technologies of closely structured questions and answers to reach "a higher spiritual existence."
>
> The Church asserts that the unsupervised, premature exposure of an adherent to these materials will produce a spiritually harmful effect.

*Religious Technology Center v. Wollersheim*, 796 F.2d 1076, 1077 (9th Cir.1986), *cert. denied*, 479

from approximately 1968 until 1982. During his years with the Church, Erlich received training to enable him to provide ministerial counseling services, known as "auditing." While with the Church, Erlich had access to various Scientology writings, including those of the Church's founder, L. Ron Hubbard ("Hubbard"), which the Church alleges include published literary works as well as unpublished confidential materials (the "Advanced Technology works"). According to plaintiffs, Erlich had agreed to maintain the confidentiality of the Advanced Technology works.

Since leaving the Church, Erlich has been a vocal critic of Scientology and he now considers it part of his calling to foster critical debate about Scientology through humorous and critical writings. Erlich has expressed his views about the Church by contributing to the Internet "Usenet newsgroup"[5] called "alt.religion.scientology" ("the newsgroup"), which is an on-line forum for the discussion of issues related to Scientology.[6]

Plaintiffs allege that in the six months prior to their filing suit, Erlich unlawfully posted to the newsgroup works from two separate categories of writings by Hubbard which are contained in Exhibits A and B of the FAC. Following Hubbard's death in 1986, ownership of Hubbard's copyrights passed to Author's Family Trust–B. In 1993, the copyrights were distributed to the Church of Spiritual Technology ("CST"), a California nonprofit religious corporation. Plaintiff Bridge Publications, Inc. ("BPI"), a nonprofit branch of the Church, claims to be the exclusive licensee of CST's copyrighted literary works listed in Exhibit A to the Complaint ("Exhibit A works"), which consist mainly of policy letters and bulletins from the Church.

Plaintiff Religious Technology Center ("RTC"), a nonprofit religious corporation, "was formed by Scientologists, with the approval of [Hubbard], to act as the protector of the religion of Scientology and to own, protect, and control the utilization of the Advanced Technology[7] in the United States." FAC, Ex. C, at 2. RTC claims to be the exclusive licensee of the copyrights and the owner of the other rights in the unpublished Advanced Technology works listed in Exhibit B to the Complaint (the "Advanced Technology" works or the "Exhibit B works").

BPI and RTC allege that Erlich infringed the copyrights in the Exhibit A and B works. RTC also alleges that Erlich misappropriated its trade secrets in the Exhibit B works, the confidentiality of which it alleges has been the subject of elaborate security measures. RTC further claims that those works are extremely valuable to the Church. Erlich admits to having posted excerpts from some of the works, but argues that the quotations were used to provide context for debate and as a basis for his criticism. Erlich further argues that he has neither claimed authorship of any of the works nor personally profited from his critique, satire, and commentary. Erlich contends that all of the Exhibit B documents he posted had been previously

---

U.S. 1103, 107 S.Ct. 1336, 94 L.Ed.2d 187 (1987).

**5.** Usenet news, which is one of the most popular features of the Internet, allows users of systems "subscribing" to the groups to participate by reading and "posting" messages on a particular topic, such as intellectual property rights ("misc.int-property") or table tennis ("rec.sport.table-tennis"). "Posting," as a noun, refers to an article in a newsgroup and, as a verb, refers to the act of sending an article one has written for distribution to the newsgroup's subscribers. When a message is posted to a group, it is distributed to the computers of all those systems that subscribe to that group so that the users of that system can access the message. There are currently thousands of different newsgroups, with about 50,000 new articles posted each day.

John R. Levine & Carol Baroudi, *The Internet for Dummies* 131 (2d ed. 1994).

**6.** Erlich gained access to the Internet by using a personal computer and a modem in his home to connect to defendant Klemesrud's BBS, to which Erlich was one of 512 subscribers paying an annual fee. Klemesrud Decl. ¶ 13. Klemesrud's BBS, in turn, was connected to the Internet through an arrangement with defendant Netcom under which Klemesrud leased access to the Internet at a fixed rate.

**7.** These works are part of the "course" materials used in the upper-levels of Scientology training, and are only available to those Scientologists who have successfully completed all of the lower courses.

posted anonymously over the Internet, except for item 1, which he claims he received anonymously through the mail.

From August to December 1994, plaintiffs exchanged a series of letters with Erlich, warning him to stop posting their protected writings onto the newsgroup. Plaintiffs also demanded that defendants Netcom and Klemesrud take actions to prevent Erlich's continued postings of protected materials. Erlich indicated that he would not stop, claiming he had a right to continue with his criticism and satire. On February 8, 1995, plaintiffs filed this action against Erlich, Klemesrud, and Netcom for copyright infringement and, against Erlich alone, for misappropriation of trade secrets, seeking actual, statutory, and punitive damages, injunctive relief, impoundment of the infringing materials and equipment, and attorneys' fees and costs.

On February 10, 1995, the court granted plaintiffs' ex parte application for a temporary restraining order ("TRO") prohibiting Erlich from making unauthorized use of works identified in the exhibits to the complaint and an order directing the clerk to issue a writ of seizure under 17 U.S.C. § 503(a). On February 13, 1995, in execution of the writ of seizure, local police officers entered Erlich's home to conduct the seizure. The officers were accompanied by several RTC representatives, who aided in the search and seizure of documents related to Erlich's alleged copyright infringement and misappropriation of trade secrets. Erlich alleges that RTC officials in fact directed the seizure, which took approximately seven hours. Erlich alleges that plaintiffs seized books, working papers, and personal papers. After locating Erlich's computers, plaintiffs allegedly seized computer disks and copied portions of Erlich's hard disk drive onto floppy disks and then erased the originals from the hard drive. Although plaintiffs returned to Erlich's counsel some of the articles seized, Erlich contends that plaintiffs have

not returned all of the seized articles, including ones that are unrelated to the litigation.

On February 23, 1995, the court issued an "Amended TRO," which sought to clarify what types of use were prohibited and to emphasize that Erlich could make "fair use" of the Exhibit A works.

## II. PRELIMINARY INJUNCTION/DISSOLUTION OF TEMPORARY RESTRAINING ORDER [8]

### A. Legal Standards

A party seeking a preliminary injunction may establish its entitlement to equitable relief by showing either (1) a combination of probable success on the merits and the possibility of irreparable injury, or (2) serious questions as to these matters and that the balance of hardships tips sharply in its favor. *First Brands Corp. v. Fred Meyer, Inc.,* 809 F.2d 1378, 1381 (9th Cir.1987). These two tests are not separate, but represent a continuum of equitable discretion whereby the greater the relative hardship to the moving party, the less probability of success need be shown. *Regents of University of California v. American Broadcasting Cos.,* 747 F.2d 511, 515 (9th Cir.1984). The primary purpose of a preliminary injunction is to preserve the status quo pending a trial on the merits. *Los Angeles Memorial Coliseum Commission v. National Football League,* 634 F.2d 1197, 1200 (9th Cir.1980).

### B. Likelihood of Success on Copyright Infringement Claims

To establish copyright infringement, plaintiffs must demonstrate (1) they own a valid copyright and (2) Erlich violated any of their exclusive rights, including, *inter alia,* the rights to reproduce or prepare derivative works from the original, or to distribute or display copies publicly. 17 U.S.C. §§ 106(1)–(3) & (5), 501(a); *Feist Publications, Inc. v. Rural Telephone Service Co.,* 499 U.S. 340, 361–63, 111 S.Ct. 1282, 1296, 113 L.Ed.2d 358 (1991). Erlich, for the most part, admits to having "copied" the Exhibit A and B works, but contends that plaintiffs are not able to

---

8. The parties treated the motion to dissolve the TRO as superseding the earlier application for a preliminary injunction. The court finds no differences in the legal standards for dissolving a TRO and for granting a preliminary injunction, except for the potentially different relevant timeframes. Here, both motions concern whether further injunctive relief prior to trial is appropriate. Accordingly, the motions will be discussed together.

establish ownership of a valid copyright interest in those works. Erlich also argues that his activities do not constitute infringement because his use was a "fair use."

## 1. Ownership of a Valid Copyright

Proof of ownership of an existing, valid, and registered copyright interest is a statutory prerequisite to filing an infringement action. 17 U.S.C. § 411. Registration, when "made before or within five years after first publication of the work[,] shall constitute prima facie evidence of the validity of the copyright," including originality, compliance with statutory formalities, and copyrightability. *Id.*, § 410(c); 3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* (1995) ("Nimmer") § 12.11[B]. When registration is made more than five years after first publication, the evidentiary weight of the certificate of registration is within the court's discretion. *Id.* § 12.11[A], [B]. When the plaintiff is not the author of a work, he must provide evidence of a chain of title from the registrant to him. Nimmer § 12.11[C].

Plaintiffs provide evidence of registration for all of the Exhibit A and B works. *See* FAC, Ex. H. Plaintiffs further provide copies of assignment and licensing agreements purportedly showing the necessary chain of title from Hubbard, the author of the works, to plaintiffs RTC and BPI. Attached to the FAC are assignments of all rights in the Advanced Technology works from Hubbard and his estate to RTC. *Id.*, Exs. C, D, F & G. Under the "Literary Agreement" attached to the FAC, BPI is the exclusive licensee of various published, non-fiction Hubbard works, including those works in Exhibit A to the FAC. *Id.*, Ex. E.

Erlich sets forth in his "Appendix re: Copyright Issues" a host of purported irregularities and defects with the registrations, maintaining that plaintiffs have failed to prove a likelihood of success on ownership of many, if not all, of the works. The court finds that, except as to item 4 of Exhibit A, Erlich has failed to rebut the presumption of validity.

■ Erlich's contention that item 4 of Exhibit A ("20 Nov 1961, Routine 3D Commands") has fallen into the public domain appears to be correct. The registration for item 4 gives a first publication date of 1961. Under the Copyright Act of 1909 ("the 1909 Act"), which still applies to works that were first published prior to January 1, 1964, an author is entitled to an initial 28-year copyright term, which expires unless the copyright is renewed by the author or his statutory successors during the final year of the initial term. 2 Nimmer § 9.05[B][1]. The copyright notice date on item 4 is evidence that the work was first published in 1961. *See New Era Publications International, ApS v. Carol Publishing Group*, 729 F.Supp. 992, 995 (S.D.N.Y.), *aff'd in part, rev'd in part*, 904 F.2d 152 (2d Cir.), *cert. denied*, 498 U.S. 921, 111 S.Ct. 297, 112 L.Ed.2d 251 (1990). Because there is no evidence that the copyright for item 4 was renewed in 1989, 28 years after its initial publication, the court finds that it fell into the public domain and cannot be the subject of an action for infringement. *See id.* Plaintiffs argue, however, that item 4 was part of a collection that was registered in 1976, the year that it was first published. As such, plaintiffs contend that the collective work is not yet subject to renewal. While those parts of the 1976 collection that were first published in 1976 were not subject to renewal in 1989, those previously published portions of the collection, such as item 4, must still be timely renewed notwithstanding the registration as a collection in 1976. *See* 1 Nimmer §§ 3.07[C], 3.04[A], at 3–19.

■ Erlich's next claim is that plaintiffs have not registered the works that were infringed, but only the compilations in which they were included. Where, as here, the author of a collection or derivative work is also the author of the preexisting work, registration of the collection is sufficient. *Abend v. MCA, Inc.*, 863 F.2d 1465, 1471–72 (9th Cir.1988), *aff'd*, 495 U.S. 207, 110 S.Ct. 1750, 109 L.Ed.2d 184 (1990); 2 Nimmer § 7.16[B][2], at 7–168 to –170 (distinguishing this situation from that where copyright owner of collective work is not also the owner of the preexisting work). Here, Hubbard was the author of the underlying work and was also the author of the collection of his own works. Accordingly, registration of the col-

lections that include the Exhibit A works constitutes registration of the underlying works.

■ Erlich's next argument, that plaintiffs have not shown that Hubbard's statutory successors assigned the renewal terms of the copyrights to plaintiffs, is clearly rebutted by the evidence. *See* Hawkins Decl., Exs. A–I. The Exhibit B works do not require renewal because they were unpublished as of January 1, 1978, the effective date of the Copyright Act of 1976 ("the 1976 Act"), and were thus protected only by common law copyright. *See* 2 Nimmer § 9.01[B][2], at 9–17 to –18. As of January 1, 1978, these works became protected by statutory copyright under the new scheme of the 1976 Act, which does not require renewal. *Id.*

■ Finally, Erlich contends that the automatic statutory presumption of validity does not apply because many of the works were published more than five years before registration. The dates specified in a copyright notice are evidence of the date of publication. *New Era*, 729 F.Supp. at 995. As to the unpublished [9] Exhibit B works, registrations were made before first publication in accordance with section 410(c) and thus the presumption is still valid. However, it appears Erlich is correct that the statutory presumption does not apply as to items 1, 2, 4, 5, 6, 7, and 8 of Exhibit A. It is within the court's discretion what weight to give the copyright registrations in determining the

validity of the copyright interests of those works for which plaintiffs are not entitled to an automatic presumption of validity. In light of plaintiffs' evidence of validity, *see* Hawkins Decl., and the lack of a persuasive challenge to the validity of the copyrights by Erlich, the court finds that plaintiffs' registrations are strong evidence of the validity of their claimed copyrights.[10]

### 2. Direct Infringement

Except as to item 9 of Exhibit A and item 9 of Exhibit B, *see* Oakley May 12, 1995 Decl., Ex. B, Erlich does not dispute that he engaged in "copying," which would constitute direct infringement under section 106. As to the item 9 works, there is no evidence that Erlich ever made any postings of or otherwise copied those items. The court will therefore consider plaintiffs' infringement claims as to the remaining works.[11]

### 3. Fair Use Defense

■ "Infringement" consists of violating the author's exclusive rights. 17 U.S.C. § 501. Although the author has the exclusive rights to reproduce, distribute, and display a copyrighted work under section 106, these rights are limited by the defense [12] of "fair use":

> Notwithstanding the provisions of section 106 and 106A, the <u>fair use of a copyrighted work</u>, including such use by reproduction

---

9. Although the court concludes in its discussion of the trade secrets claim, *infra* part II.C.3, that most of the Exhibit B works may no longer contain trade secrets (assuming they ever did), this does not mean that, for the purposes of copyright protection, they are not unpublished. "Publication," as defined in 17 U.S.C. § 101, requires that the owner *consent* to selling, leasing, loaning, giving away, or otherwise making available to the general public, the original or copies of the work. 1 Nimmer § 4.04, at 4–17 to –19 & n. 8. There is no evidence of any consensual release of any of these works to the public.

10. The court is unpersuaded by the various alleged technical deficiencies, such as title discrepancies, in the copyright registrations. Errors, such as incorrectly naming the author, do not make the copyright invalid absent some evidence that the defendant was misled. 2 Nimmer § 7.20, at 7–201 to –207.

11. The court will address the issue of direct infringement more fully in its order on the motions concerning defendants Netcom and Klemesrud.

12. Even though fair use is an affirmative defense, *Harper & Row, Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 561, 105 S.Ct. 2218, 2231, 85 L.Ed.2d 588 (1985), the court notes that plaintiffs, as the parties moving for a preliminary injunction, have the burden of proving a likelihood of success on their infringement claim, including the fair use defense. *See* 2 William Schwarzer et al., *California Practice Guide: Federal Civil Procedure Before Trial* ¶ 13:47 (1994) (citing *Original Appalachian Artworks v. Topps Chewing Gum*, 642 F.Supp. 1031, 1034 (N.D.Ga. 1986)). However, in determining whether plaintiffs have met their burden, the court recognizes that fair use is an affirmative defense on which defendants will have the burden of proof at trial.

in copies ... or by any other means specified in that section, <u>for purposes such as criticism</u>, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, <u>is not an infringement</u> of copyright.

17 U.S.C. § 107 (emphasis added). The defense "permits and requires courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster." *Campbell v. Acuff–Rose Music, Inc.*, 510 U.S. 569, ——, 114 S.Ct. 1164, 1170, 127 L.Ed.2d 500 (1994) (citation omitted). Congress has set out four nonexclusive factors to be considered in determining the availability of the fair use defense:

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107. The fair use doctrine calls for a case-by-case analysis. *Campbell*, 510 U.S. at ——, 114 S.Ct. at 1170. All of the factors "are to be explored, and the results weighed together, in light of the purposes of copyright." *Id.* 510 U.S. at ——–——, 114 S.Ct. at 1170–71.

### a. *First Factor: Purpose and Character of the Use*

■ The first statutory factor looks to the purpose and character of the defendant's use. Erlich argues that his use was criticism, which is one of those uses listed in the preamble to section 107. Similarly, Erlich maintains that his use was meant to "evoke discussion regarding various Scientology philosophies." Mot. To Dissolve at 22. Use for the purpose of criticism weighs in favor of fair use. *See New Era*, 904 F.2d at 156–57 (using Hubbard's works in critical biography

meets first factor for fair use). Plaintiffs contest Erlich's characterizations of his use, claiming that most of Erlich's postings were verbatim copies, with little or no added comment or criticism.[13] Plaintiffs further contend that Erlich's purpose was spite or some other destructive reason. However, plaintiffs give no explanation as to why Erlich's purpose was other than to criticize or to evoke discussion regarding Scientology. Because there is insufficient evidence to support plaintiffs' claim that Erlich's copying was made out of spite or for other destructive reasons, the court will assume Erlich's intended purpose was criticism or comment.

### *Transformative Use*

■ Plaintiffs' argument that the amount of added criticism belies Erlich's critical purpose can also be construed as an attack on the "transformative" nature of Erlich's use. In *Campbell*, the Supreme Court held that the central purpose of the first inquiry is to determine whether the new work is transformative (also described as "productive"), that is, whether it "adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." 510 U.S. at ——, 114 S.Ct. at 1171. Erlich's use is only minimally transformative since, unlike the typical critic, Erlich adds little new expression to the Church's works. Accordingly, despite Erlich's purported critical purpose, the actual character of his use does not weigh heavily in his favor because it has only a slight transformative nature. In any case, the Supreme Court held in *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 455 n. 40, 104 S.Ct. 774, 795 n. 40, 78 L.Ed.2d 574 (1984) that the fair use defense is not "rigidly circumscribed" by the productive use requirement. The Court found that a home viewer's verbatim copying of copyrighted television shows for the purposes of time shifting was fair use even though there was only a minimal showing of increased convenience to the home user.

---

**13.** Erlich responds that the documents that he posted "speak for themselves," and thus little further commentary was necessary. The court will address this dispute under the third statutory factor.

### Commercial Nature of Use

Where the use is not highly transformative, as here, the court will focus on whether the use is of a commercial nature. The *Campbell* Court emphasized that a commercial use does not dictate against a finding of fair use, as most of the uses listed in the statute are "generally conducted for profit in this country." 510 U.S. at ——, 114 S.Ct. at 1174. Nonetheless, the Court recognized that a commercial use weighs against a finding of fair use. *Id.* The fact that there is no evidence that Erlich gains financially from his criticism of the Church weighs in his favor.

Plaintiffs argue, however, that Erlich personally gains through increased status and recognition among his peers and the public. In *Weissmann v. Freeman*, 868 F.2d 1313 (2d Cir.), *cert. denied*, 493 U.S. 883, 110 S.Ct. 219, 107 L.Ed.2d 172 (1989), the Second Circuit recognized that, in the unusual setting of academia, a defendant can profit personally from copying despite the lack of a monetary gain. The defendant in *Weissmann* was a professor who copied a former assistant's scholarly work, used it for the same purpose as the author, and claimed credit for himself, thereby aiding his professional advancement. *Id.* at 1324. Here, there is neither evidence that Erlich took credit for any of plaintiffs' works nor that he is personally profiting, professionally or otherwise, as a result of his postings. If mere recognition by one's peers constituted "personal profit" to defeat a finding of a noncommercial use, courts would

seldom find any criticism fair use and much valuable criticism would be discouraged. Thus, the court finds that *Weissmann* is inapplicable here, and that its holding should not be stretched to swallow all nonprofit criticism motivated by concern for status. Accordingly, based on the clearly noncommercial nature of the use and the protected purpose of criticism, the court finds that the first fair use factor weighs slightly in Erlich's favor despite the minimally transformative nature of Erlich's use.

### Defendant's Conduct

Plaintiffs contend that, regardless of the results of weighing the four fair use factors, a finding of fair use is nonetheless precluded because Erlich's copies were made not from legitimate copies of the works but from unauthorized copies. Although plaintiffs discuss this purported "good faith" pre-requisite [14] to fair use apart from the four factors, it is properly a factor to be considered with the first statutory factor regarding the character of the use. 3 Nimmer § 13.05[A][1][d], at 13–171 to –174 (discussing "defendant's conduct" as one aspect of the first statutory factor).

The court finds that plaintiffs' showing on bad faith is mixed at best. There is no evidence here that Erlich obtained his copies of plaintiffs' works through deceit. *Cf. Atari*, 975 F.2d at 836, 843 (finding no fair use where defendant obtained plaintiff's source code by lying to copyright office).

14. Plaintiffs cite *Sega Enterprises Ltd. v. Maphia*, 857 F.Supp. 679 (N.D.Cal.1994) for the proposition that there can be no fair use defense where the defendant did not use an authorized copy to make his copies. In *Sega*, the defendant, who had allegedly copied Sega videogame cartridges onto an electronic BBS where others could copy them, *id.* at 683, admitted that he did not own any copies of Sega's game cartridges, *id.* at 687. *Sega* relies on language from *Atari Games Corp. v. Nintendo of America Inc.*, 975 F.2d 832, 843 (Fed.Cir.1992) stating that "[t]o invoke the fair use exception, an individual must possess an authorized copy of a literary work." *Atari*, in turn, relies on *Harper & Row's* discussion of the first statutory factor. In *Harper & Row*, 471 U.S. at 563, 105 S.Ct. at 2232, the Supreme Court cited the trial court's finding that the defendant "knowingly exploited a purloined manuscript" as weighing against a finding of fair use on the first

factor. Nothing in *Harper & Row* indicates that the defendant's bad faith was itself conclusive of the fair use question, or even of the first factor. After *Campbell*, it is clear that a finding of bad faith, or a finding on any one of the four factors, cannot be considered dispositive. *Campbell*, 510 U.S. at —— ——, —— & n. 18, 114 S.Ct. at 1170–71, 1174 & n. 18. *Campbell* cited *Harper & Row's* good faith discussion without comment, but noted that the defendant's use of the plaintiff's work, despite the plaintiff's explicit denial of permission, would not, in any case, constitute bad faith. *Id.* at —— n. 18, 114 S.Ct. at 1174 n. 18. *Campbell*, the Supreme Court's most recent pronouncement on fair use, thus hardly endorses the good faith requirement. *See* 3 Nimmer § 13.05[B][3], at 13–205 n. 298. Accordingly, the court will treat bad faith as merely one aspect of the first factor.

Unlike *Sega*, there is no admission by the defendant that he does not possess *any* legal copies. As to several of the Exhibit A works, it appears that Erlich possessed legitimate, published books containing some of the works; plaintiffs offer no evidence that Erlich obtained these books in some unlawful or illegitimate manner.[15] However, as to those works where Erlich claims he obtained his copies over the Internet or anonymously through the mail, this does not negate an inference that he received those copies in an improper manner. Erlich's copies of Exhibit B works were more likely unauthorized than not; plaintiffs have provided substantial evidence that the Advanced Technology works are kept confidential, *see infra* part II.C.2, and that Erlich would not have been given permission to keep a copy of those works. For most of the disputed works, the fact that Erlich may have obtained his copies in an unauthorized manner tends to weigh in plaintiffs' favor. This finding, however, will not bar Erlich's fair use defense, but will merely be considered with the other factors.

### b. *Second Factor: Nature of the Copyrighted Work*

The second factor focuses on two different aspects of the copyrighted work: whether it is published or unpublished and whether it is informational or creative.

#### *Published vs. Unpublished*

 The unpublished status of a work is "a critical element of its 'nature.'" *Harper & Row*, 471 U.S. at 564, 105 S.Ct. at 2232 (finding no fair use where *The Nation* magazine used unpublished manuscript to scoop *Time* magazine). The *Nation* case held that "the scope of fair use is narrower with respect to unpublished works." *Id.* In a case involving copying of allegedly unpublished works by Hubbard, the Second Circuit recognized that where the works were unpublished no court had yet found in favor of the infring-

er on the second factor. *New Era*, 904 F.2d at 155. Nevertheless, the Second Circuit affirmed a finding of fair use where a biographer quoted portions of unpublished letters. *Wright v. Warner Books, Inc.*, 953 F.2d 731 (2d Cir.1991); *see also Norse v. Henry Holt & Co.*, 847 F.Supp. 142, 147 (N.D.Cal.1994) (finding fair use where 50 words copied from unpublished letters and all but the second factor weighed in favor of defendant). In 1992, Congress amended section 107 of the 1976 Act to clarify that the unpublished nature of a work should not itself bar a finding of fair use. *See* H.R.Rep. No. 102–286, 102d Cong., 2d Sess. 8 (1992) (House Report) (citing *Wright* with approval and criticizing earlier Second Circuit decisions that created a per se rule against fair use of unpublished works); *see also* 3 Nimmer § 13.05[A][2], at 13–184 to –186. Congress construed the *Nation's* statement that the *scope* of fair use is narrower for unpublished works to mean that the *amount* of permissible copying will be less in the case of an unpublished work. *Id.*

 Even though a work is read by a large group of people, it is still unpublished where it is held confidential and the authors do not relinquish control over their copies of the work. *See College Entrance Examination Board v. Cuomo*, 788 F.Supp. 134, 139–41 (N.D.N.Y.1992) (finding that administered secure tests were necessarily unpublished because author did not relinquish control and finding for author on second fair use factor). Plaintiffs have adequately demonstrated that the Exhibit B Advanced Technology works are kept confidential using tight security measures. *See infra* part II.C.3. Although there is evidence that individuals may have made unauthorized public disclosures of some of these works, *see id.*, the works are still "unpublished" for the purposes of the fair use defense. *See* discussion *supra* note 9. However, the Exhibit A works, with one exception, are published. Accordingly, this portion of the second factor weighs in Er-

---

15. The court is unpersuaded by plaintiffs' argument that an intermediate copy made for the purposes of posting or uploading a work makes the subsequent copy unauthorized such that fair use is unavailable. *Sega* and *Atari* merely suggest that fair use is unavailable where the defendant does not possess *any authorized copy;* not that the challenged copying cannot be made from a secondary copy. While the extra copying may constitute infringement (for which there may or may not be a separate fair use defense), it should not affect the availability of the fair use defense as to the critical or parodic use.

lich's favor as to the published Exhibit A works and strongly in plaintiffs' favor as to the Exhibit B works.

### Informational vs. Creative

 The second aspect of this factor looks to broaden the protection of those works that are creative, fictional, or highly original and lessen the protection for those works that are factual, informational, or functional. *See Campbell,* 510 U.S. at ——, 114 S.Ct. at 1175. The Second Circuit noted the obvious difficulty in applying this test in a case involving a large number of works by Hubbard:

> We agree ... that there is no easy distinction between works that are "factual" on the one hand, and "creative" or "expressive" on the other, because " '[c]reation of a nonfiction work, even a compilation of pure fact, entails originality.' " Thus, reasonable people can disagree over how to classify Hubbard's works.

*New Era,* 904 F.2d at 158 (citations omitted). The Second Circuit concluded that "although some of the quoted passages can accurately be described as expressive—e.g., Hubbard's poetry—our review of the record persuades us that most simply cannot be so characterized." A district judge in this Circuit, considering works that are part of the Church's Advanced Technology, concluded that "Hubbard's works are the product of his creative thought process, and not merely informational." [16] *Bridge Publications, Inc. v. Vien,* 827 F.Supp. 629, 635–36 (S.D.Cal.1993).

In the present case, this court also finds the task of categorizing Hubbard's writings difficult. In their complaint, plaintiffs describe Hubbard as the author of "original works on applied religious philosophy and spiritual healing technology, including training materials and course manuals of the Scientology religion." FAC ¶ 9. In reviewing the Exhibit A works, which are predominantly "policy letters" of the Hubbard Communications Office, the court finds that these works, although creative, are primarily functional or instructive. Item 1 of Exhibit B, the Class VIII "Assists" Tape, appears more

original and creative than the other works, and is thus deserving of greater fair use protection. The remaining Exhibit B works, however, are part of the methodology of the Church's "applied religious philosophy," and as such are more instructive and functional than fictional. This court is not convinced, however, that this factor should play a major role in the context of religious works, which do not easily fit into the creative/informational dichotomy.

Because the Exhibit B works are unpublished and large portions of them were copied by Erlich, *see infra* part II.B.3.c, this factor weighs heavily against Erlich with respect to those works, despite the informational nature of most of them. The Exhibit A works, however, are published and primarily informational, and this factor weighs in favor of Erlich as to those works.

### c. *Third Factor: Amount and Substantiality of the Portion Used*

 The third factor concerns both the percentage of the original work that was copied, and whether that portion constitutes the "heart" of the copyrighted work. *Harper & Row,* 471 U.S. at 564–65, 105 S.Ct. at 2232–33. The copying of an entire work will ordinarily militate against a finding of fair use, although this is not a per se rule. *Sony,* 464 U.S. at 449–450, 104 S.Ct. at 792 (finding exception to this rule for time-shifting by home viewers to enable them to see works that they were invited to see in their *entirety* free of charge). The amount of copying that is acceptable will depend on the character of the use and degree to which the copy transforms the original. *Campbell,* 510 U.S. at ——–——, 114 S.Ct. at 1175–76 (finding parody can copy enough of original to "conjure [it] up" so the audience will recognize what is being parodied). Less copying will be acceptable where the original is unpublished. *See* 3 Nimmer § 13.05[A][2], at 13–185 n. 200.

 Plaintiffs allege that Erlich's postings copy substantial amounts of the originals or, in some cases, the entire works.

---

**16.** Somewhat inconsistently, Erlich argues on the trade secret claim that many of the Exhibit B works are "more prosaic than formulaic." Reply at 13.

Erlich responds that, as to some of the copied works, the original documents are actually only a small part of a larger collection. *See* Oakley Reply Decl., Ex. C. Erlich claims that the court should look at the entire registered collective work to determine the percentage of that work which Erlich copied. However, the Ninth Circuit held in *Hustler Magazine, Inc. v. Moral Majority, Inc.*, 796 F.2d 1148, 1155 (9th Cir.1986) that "[a] creative work does not deserve less protection just because it is part of composite work." The Second Circuit held in *American Geophysical Union v. Texaco, Inc.*, 802 F.Supp. 1, 17 (S.D.N.Y.1992), *aff'd*, 37 F.3d 881 (2d Cir.1994) that copying an entire article from a journal whose copyright has been registered as a whole still constitutes copying the entire work. Similarly, here, although many of Hubbard's lectures, policy statements, and course packets are collected into larger volumes, and registered as a whole,

they may still constitute separate works for the purposes of this factor.

It appears Erlich copied all or almost all of many of the works,[17] which were predominantly short documents of less than three pages, and mostly with no comments or with very brief comments[18] at the beginning or end. *See* McShane February 27, 1995 Decl., Ex. A, B, C–1. The court further finds that where Erlich only copied a portion of a work, that portion constituted the "heart" of the work. *Compare* February 27, 1995 App. in Support of Warren McShane, Exs. 1A–188A *with* 1B–188B; *see Harper & Row*, 471 U.S. at 564–65, 105 S.Ct. at 2232–33 (finding quotation of 300 out of 200,000 words that were "essentially the heart of the book" not fair use). Accordingly, this factor weighs heavily in plaintiffs' favor, especially as to the unpublished works, where the amount of acceptable copying is even lower.

**17.** Erlich also argues that, even if he did copy most or all of many of the works, he copied no more than was reasonable for his purposes. Erlich cites *Belmore v. City Pages, Inc.*, 880 F.Supp. 673, 678–79 (D.Minn.1995), in which the court found fair use where the defendant copied verbatim an entire short article from a police newspaper for the purpose of criticism with added commentary constituting only about one fourth of the defendant's article. The court found reasonable the alleged infringer's explanation that he copied the original in its entirety because the original "took the form of a parable and was relatively short" and because he "decided that the repulsive message it appeared to convey could not be adequately communicated except by printing the story as a whole." *Id.* at 679. Erlich fails to mention that the *Belmore* court concluded that the third factor weighed in favor of the plaintiff; only a strong showing by the defendant on the first and fourth factor overcame the fact that the defendant had copied the entire work. Moreover, unlike the defendant in *Belmore*, Erlich never adequately explains why it was essential for him to copy verbatim the amount of the works that he copied, merely asserting in a conclusory fashion that it was "reasonable in relation to the purpose of the copying." Further, Erlich's added criticism was far less substantial than the thirty-four lines of added commentary in *Belmore*. The court is unconvinced that Erlich's wholesale copying of Hubbard's works with little or no commentary was necessary for his critical purposes.

**18.** To the extent that courts look at how much of the allegedly *infringing work* is made up of copied material, *see Harper & Row*, 471 U.S. at 565–66, 105 S.Ct. at 2233, this factor also weighs

heavily against Erlich. Most of Erlich's postings constitute verbatim quotes from Hubbard's works, with occasional commentary such as "The perfect reference for any occasion," "I believe a discussion of this policy is in order," "Any questions?" and "Someone requested this, I assume, to discuss." Standing alone, these remarks are hardly criticism or commentary.

However, Erlich argues that the critical nature of Erlich's postings must be viewed in light of the extended nature of "threads" on newsgroups. A thread is an article on a particular topic, together with all the follow-up articles, and the follow-ups to the follow-ups. Levine & Baroudi, *supra* note 5, at 399. While an entire thread might be considered one composite work authored by all those adding to the thread, there is no evidence in the record that any of Erlich's postings were followed up with further comments or criticism on the works that are excerpted. Erlich argues that it is common practice on the Internet to repeat large portions of a previous posting verbatim, which is necessary to add context for those who are late in joining a discussion. While this would perhaps justify the copying of works that were previously posted by their authors on the basis of an implied license or fair use argument, *see* Maureen A. O'Rourke, "The Future of Copyright and Contract Law in a Networked World," *Federal Bar News & Journal* (August 1994), these defenses would not apply where the first posting made an unauthorized copy of a copyrighted work. The court accepts, however, the possibility that a particular quotation of a copyrighted work in the context of a long thread that involves significant criticism or commentary could be fair use.

d. *Fourth Factor: Effect of the Use upon the Potential Market for the Work*

■ The fourth and final statutory factor concerns "the extent of market harm caused by the particular actions of the alleged infringer" and " 'whether unrestricted and widespread conduct of the sort engaged in by the defendant ... would result in a substantially adverse impact on the potential market' for the original." *Campbell,* 510 U.S. at ——, 114 S.Ct. at 1177 (quoting 3 Nimmer § 13.05[A][4]) (remanding for consideration of this factor). Although the results of all four factors must be weighed together, *id.* at ——, 114 S.Ct. at 1171, the fourth factor is central to the fair use analysis, 3 Nimmer § 13.05[A][4], at 13–188 to –189 (citing *Harper & Row,* 471 U.S. at 566, 105 S.Ct. at 2233), 13–207 (observing that fourth factor explains results in recent Supreme Court cases).

Plaintiffs contend that Erlich's posting of plaintiffs' copyrighted works over the Internet, where more than 25 million subscribers could access them, could potentially have a detrimental effect on plaintiffs. Plaintiffs point to the fact that, in the past, the Church has faced "ex-parishioners using copyrighted materials to set up and market 'religious' training adapted from the Scientology religion." Pltfs.' Opp'n at 39. In *Vien,* the defendant had left the Church of Scientology to start her own competing ministry, taking with her some of the Church's Advanced Technology works, which she used in her courses and offered for sale. 827 F.Supp. at 632–34. The court held that "since defendant uses the works for the same purpose intended by plaintiffs, it appears defendant's unauthorized copies fulfill the 'demand for the original' works and 'diminish or prejudice' their potential sale." *Id.* at 636.

■ Plaintiffs' case is not as strong here as it was in *Vien.* The demand of those seeking out the Church's religious training will hardly be met by Erlich's postings.[19] Even if Erlich's copying of plaintiffs' works

were not for a critical purpose, plaintiffs would still have not shown that Erlich's postings diminish the demand by Church followers in the courses. According to the Church, these courses must be studied in a systematic fashion, following one "course" at a time, with proper guidance. McShane May 31, 1995 Decl. ¶¶ 7–8; *see Wollersheim,* 796 F.2d at 1091 (noting RTC's argument that Advanced Technology works are trade secrets whose misappropriation would cause " 'religious harm' ... [to] adherents from premature unsupervised exposure to the materials"). Although many of Erlich's postings contain much of an original work, each of these works is only a small portion of the teachings necessary for a particular "course." *See* Oakley Reply Decl., Ex. C. For the most part, Erlich's postings are sporadic and incomplete. The court is thus not convinced that postings like Erlich's could be effectively used by rival Scientology-like religious groups. Moreover, there is no evidence that the Church currently faces any competition by ex-parishioners, *see* Oakley Reply Decl., Ex. B., McShane Depo. at 95, although there is circumstantial evidence that such competition could occur in the future, based on the fact that several groups have competed with the Church in the past. *See id.* at 93–94.

There is little evidence of a systematic attempt by Erlich at posting the complete works necessary for setting up a competing religious group. It seems unlikely, although possible, that Erlich's postings, if continued and expanded, could supply such a group with the means to compete with plaintiffs. *See* discussion *infra* part II.B.3. While the demand for a particular work may be suppressed through criticism, it is unlikely that the demand for the Church's unique ability to provide parishioners with a complete and guided access to the various course materials will be suppressed. The court finds it unlikely that Erlich's noncommercial use, or widespread conduct like Erlich's use by others, would diminish or prejudice the potential sale of plaintiffs' works, interfere with their

---

**19.** To the extent that Erlich's postings suppress demand for the original works by "persuad[ing] [potential buyers] that Hubbard was a charlatan" or that the Church is a fraud, as clearly Erlich intends, such a "devastating critique" is not

"within the scope of copyright protection." *New Era,* 904 F.2d at 160 (citation omitted); *Campbell,* 510 U.S. at ——, 114 S.Ct. at 1178 (citing *Fisher v. Dees,* 794 F.2d 432, 438 (9th Cir.1986)).

marketability, or fulfill the demand for the works. *See Maxtone–Graham v. Burtchaell,* 803 F.2d 1253, 1264 (2d Cir.1986), *cert. denied,* 481 U.S. 1059, 107 S.Ct. 2201, 95 L.Ed.2d 856 (1987) (finding no market harm where pro-choice work was excerpted in anti-abortion book because of differing viewpoints and editorial formats); *Hustler,* 796 F.2d at 1155–56; *Religious Technology Center v. Lerma,* 897 F.Supp. 260, 265 (E.D.Va.1995) (finding fair use defense probably valid in part because no separate market for Advanced Technology works where Scientologists cannot effectively use them without the Church's supervision); *Religious Technology Center v. F.A.C.T.NET, Inc.,* 901 F.Supp. 1519, 1524–26 (D.Colo.1995) (finding valid fair use defense because financial harm to the Church was unlikely and there was no showing of a potential effect on the market for plaintiffs' works). Accordingly, the court finds that this factor weighs in Erlich's favor.

### e. *Equitable Balancing*

In balancing the various factors, the court finds that the percentage of plaintiffs' works copied combined with the minimal added criticism or commentary negates a finding of fair use. Although criticism is a favored use, where that "criticism" consists of copying large portions of plaintiffs' works—and sometimes all of those works—with often no more than one line of criticism, the fair use defense is inappropriate. Erlich has not adequately justified his copying verbatim large portions of plaintiffs' works. The amount of copying was particularly unacceptable with the unpublished Exhibit B works.

While copying all or most of a work does not necessarily preclude fair use, those cases recognizing fair use for complete copying are easily distinguishable. Although the *Sony* Court found acceptable the copying of entire television shows with no added content, this was necessary for the purpose of time-shifting. Unlike Erlich, the time-shifters in *Sony* were already given permission to view the works in their entirety for free. *Sony,* 464 U.S. at 449–450, 104 S.Ct. at 792. The Court further noted in *Sony* that time-shifters are just as likely to buy prerecorded videos as live viewers, and thus there is no effect on

the market for the original. *Id.* at 450 n. 33, 104 S.Ct. at 792 n. 33. The case that perhaps best supports Erlich's position, *Belmore,* is also distinguishable. *See supra* note 17. The original work copied verbatim in *Belmore* was shorter than many of the works Erlich copied and the added criticism in *Belmore* was far longer than most of the criticism that Erlich made. 880 F.Supp. at 678–79. Additionally, unlike the district court in *Belmore,* this court does not find reasonable Erlich's claim that he copied no more than was necessary for his purpose. Moreover, this court is not convinced that *Belmore* is supported by Ninth Circuit law. *See Supermarket of Homes, Inc. v. San Fernando Valley Board of Realtors,* 786 F.2d 1400, 1409 (9th Cir.1986) ("Generally, no more of a work may be taken than is necessary to make the accompanying comment understandable.").

While use of a large percentage or the "heart" of the copyrighted work does not rule out fair use *per se,* other factors are not sufficiently in Erlich's favor to overcome this third factor. Further, the second factor weighs strongly against Erlich as to the unpublished works. The almost verbatim copying here shows that Erlich's work is only minimally transformative and that it is unlikely that Erlich is "truly pursuing a different functional milieu" from the original. 3 Nimmer § 13.05[D][1], at 13–231. In addition, as to the unpublished materials, Erlich's use of possibly illicit copies of those works weighs against him. Thus, Erlich's showing on the first factor is not very strong despite his critical purpose. Similarly, Erlich's showing on the fourth factor does not persuasively suggest fair use. If Erlich's use were to become widespread, it could potentially have an effect on the market for plaintiffs' works by supplying future splinter groups with the materials needed to compete with the Church. The court views this potentiality as somewhat remote. Nevertheless, given plaintiffs' very strong showing on the third factor, the court finds that, on balance, the equities do not favor a finding of fair use. The case against fair use is even more com-

pelling for the unpublished works.[20] *But see Lerma,* 897 F.Supp. at 265 (order denying temporary restraining order against defendant Washington Post from using Advanced Technology documents obtained from open court files in *Church of Scientology v. Fishman,* 1994 WL 467999 (9th Cir.1994); finding fair use defense exists where no separate market for works because Scientologists cannot effectively use them without the Church's supervision); *F.A.C.T.NET,* 901 F.Supp. at 1524–26 (denying preliminary injunction against copying of Advanced Technology works based on fair use defense because financial harm to the Church was unlikely, there was no commercial motive, works were used in part of "ongoing dialogue" on the Internet, and there was no showing of a potential effect on the market for plaintiffs' works).

### 4. Conclusion

Accordingly, plaintiffs have demonstrated a likelihood of success on its claims that Erlich infringed their copyrights on all of the Exhibit A and B works, except items 4 and 9 of Exhibit A and item 9 of Exhibit B.

### C. Likelihood of Success on Trade Secret Claim

 In the third cause of action, plaintiff RTC alleges that Erlich misappropriated its trade secrets. California has adopted a version of the Uniform Trade Secret Act ("UTSA"), Cal.Civ.Code § 3426.1 et seq. The UTSA defines a trade secret as

> information, including a formula, pattern, compilation, program, device, method, technique, or process, that:
>
> (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other

persons who can obtain economic value from its disclosure or use; and

> (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Cal.Civ.Code § 3426.1(d).[21] The UTSA further defines "misappropriation" of a trade secret as

> (1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> (2) Disclosure or use of a trade secret of another without express or implied consent by a person who:
>
>> (A) Used improper means to acquire knowledge of the trade secret; or
>>
>> (B) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was:
>>
>>> (i) Derived from or through a person who had utilized improper means to acquire it;
>>>
>>> (ii) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
>>>
>>> (iii) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
>>
>> (C) Before a material change of his or her position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

*Id.* § 3426.1(b).

To establish its trade secret claim, RTC must show, *inter alia,* that the Advanced Technology works (1) have independent eco-

---

**20.** The court notes the difficulty of coming to this conclusion based on the lack of guidance in how to weigh the various factors. *See Rubin v. Brooks/Cole Publishing Co.,* 836 F.Supp. 909, 922 (D.Mass.1993) (citing 3 Nimmer § 13.05[A][5], at 13–199).

**21.** The new Restatement provides a similar definition of a trade secret:

> A trade secret is any information that can be used in the operation of a business or other enterprise and that is sufficiently valuable and

secret to afford an actual or potential economic advantage over others.

Restatement (Third) of Unfair Competition ("Restatement") § 39, at 425 (1995). Although California has adopted the UTSA, courts also look to the Restatement to help interpret the UTSA. *See* Restatement § 39, cmt. b, at 427; *cf.* 1 Milgrim § 1.01[1], at 1–3 (noting that UTSA jurisdictions frequently rely on the Restatement's definition of a trade secret).

nomic value to competitors and (2) have been kept confidential.

### 1. Nature of Works ˙

As a preliminary matter, Erlich argues that the Advanced Technology works cannot be trade secrets because of their nature as religious scriptures. In *Wollersheim*, 796 F.2d at 1090–91, the Ninth Circuit rejected the Church's application for a preliminary injunction on the basis of a trade secret claim against a splinter Scientology group that had acquired stolen copies of the Advanced Technology. The Church argued not that the works gave them a competitive market advantage but that disclosure of the works would cause its adherents "religious harm . . . from premature unsupervised exposure to the materials." *Id.* Although the Ninth Circuit rejected plaintiffs' trade secret argument based on the *spiritual* value of the harm, it later noted that it had left open the question of whether the Advanced Technology works could qualify as trade secrets, assuming plaintiffs could prove that the secrets confer on them an actual *economic* advantage over competitors. *Religious Technology Center v. Scott*, 869 F.2d 1306, 1310 (9th Cir.1989); *cf. Vien*, 827 F.Supp. at 629.[22] Nonetheless, the court noted that such an allegation would "raise grave doubts about [the Church's] claim as a religion and a not-for-profit corporation." [23] *Id.* (quoting *Wollersheim*, 796 F.2d at 1091).

The Church contends that the Advanced Technology works consist of *"processes* and the theory behind those processes . . . that are to be used precisely as set forth by L. Ron Hubbard to assist the parishioner in achieving a greater spiritual awareness and freedom." McShane February 27, 1995 Decl. ¶ 9 (emphasis added). Erlich responds that the works are essentially religious texts. *Cf.*

FAC ¶ 9 (describing Hubbard as author of "applied religious philosophy and spiritual healing technology" and works as "training materials and course manuals of the Scientology religion"). Erlich argues that the Church cannot have trade secrets because trade secret law is necessarily related to commerce. *See Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 481, 485, 94 S.Ct. 1879, 1886, 1888, 40 L.Ed.2d 315 (1974). The Church contends that, like other organizations, it must pay bills, and that licensing fees from these documents allow it to continue operating. McShane February 27, 1995 Decl. ¶ 7.

■■■ The Church's status as a religion does not itself preclude it from holding a trade secret. Restatement § 39 cmt. d, at 429 ("[N]onprofit entities such as . . . religious organizations can also claim trade secret protection for economically valuable information such as lists of prospective members or donors."); UTSA § 3426.1(c) (defining "person" to include a "corporation . . . or any other legal or commercial entity"); *cf. United Christian Scientists v. Christian Science Board of Directors*, 829 F.2d 1152, 1169 (D.C.Cir.1987) (noting that Church was entitled to copyright protection on same basis as nonreligious groups). With the exception of the *Vien* case, there is little authority to support a finding that religious materials can constitute trade secrets. However, there is "no category of information [that] is excluded from protection as a trade secret because of its inherent qualities." *Clark v. Bunker*, 453 F.2d 1006, 1009 (9th Cir.1972) (citing Restatement of Torts, § 757 cmt. b, at 5) (upholding as a trade secret a "detailed plan for the creation, promotion, financing, and sale of contracts for 'prepaid' or 'pre-need' funeral services"); *see also Smith v. Dravo*

**22.** In granting summary judgment for the Church on its claim that a splinter group had misappropriated the Advanced Technology works, the Southern District of California did not address this preliminary question of whether religious scriptures should be unprotectable as trade secrets because of their noncommercial, religious nature. *Vien*, 827 F.Supp. 629. Instead, the court found that the works were trade secrets because the Church had used reasonable steps to keep the works secret and because they had

independent economic value both to plaintiffs, who use the proceeds from the sale of these materials to support the operation of the Church, and to the defendant, who was a competitor of the Church who also charged for Scientology-like courses. *Id.* at 633–34.

**23.** Neither the Church's status as a religion nor its not-for-profit status are at issue in the current dispute.

*Corp.,* 203 F.2d 369, 373 (7th Cir.1953) ("We assume that almost any knowledge or information used in the conduct of one's business may be held by its possessor in secret.").

Nor is there any authority to support Erlich's argument that the Church's religious texts cannot be trade secrets because, unlike most trade secrets, these secrets are not *used* in the production or sales of a commodity but *are the commodities themselves.* The Church's Advanced Technology "course" materials, which are an integral part of the Church's spiritual counseling techniques, do not appear fundamentally different from the course manuals upheld as trade secrets in *SmokEnders, Inc. v. Smoke No More, Inc.,* 184 U.S.P.Q. 309 (S.D.Fla. 1974):

> The [SmokEnders ("SE")] program requires attendees to follow a rigid structured regimen comprised of specific assignments and detail[ed] concepts as recited in [the manual].....
>
> The SE program is a step-by-step regimented program which requires that each person attending a SE program perform each act of the program at a particular time. Each act required by a SE seminar attendee must be performed by attendees at the same time in the program, with each a minimum departure from the program.
>
> <u>The SE trade secret resides in the composite program as it is arranged for step-by-step delivery to the attendees.</u>

*Id.* at 312 (emphasis added). *SmokEnders* is arguably distinguishable because only the "moderators" and not the attendees were given access to the course materials in that case. However, the adherents of the Church, unlike the attendees and like the moderators in *SmokEnders,* are under a duty of confidentiality as to the materials. This case is analogous to *SmokEnders* because in both cases the "commodity" that is produced from the trade secrets is the result achieved by the person using the course materials and their techniques (whether it be stopping smoking or reaching a "higher spiritual existence").

Thus, there is at least some precedent for granting trade secret status to works that are techniques for improving oneself (though not specifically spiritually). Conversely, there is no authority for excluding religious materials from trade secret protection because of their nature. Indeed, there is no authority for excluding any type of information because of its nature. While the trade secret laws did not necessarily develop to allow a religion to protect a monopoly in its religious practices, the laws have nonetheless expanded such that the Church's techniques, which clearly are "used in the operation of the enterprise," Restatement § 39, at 425, are deserving of protection if secret and valuable.

Although trade secret status may apply to works that are techniques for spiritually improving oneself, the secret aspect of those techniques must be defined with particularity. *See* Restatement § 39 cmt. d, at 430 (requiring plaintiff to define the information claimed as a trade secret with sufficient definiteness). It appears that plaintiffs are claiming that the entire works themselves, which they describe as "processes and the theory behind those processes," constitute the trade secrets. *See* Pltfs.' Mem. in Support of Prelim.Inj. at 17. This definition is problematic because it is impossible to determine when the "secret" has been lost after portions of the works have been disclosed. *Cf. F.A.C.T.NET,* 901 F.Supp. at 1527 ("In the course of the hearing ... RTC changed its position with regard to what materials constitute the purported trade secrets."). Although plaintiffs' definition has at least some support in *SmokEnders,* where the court upheld as a trade secret a "composite [stop-smoking] program" found in an instructional manual, 184 U.S.P.Q. at 312, this court is not satisfied that plaintiffs have identified their trade secrets with sufficient definiteness to support injunctive relief.

### 2. Independent Economic Value

A trade secret requires proof of "independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use." UTSA § 3426.1(d)(1). A trade secret must

have sufficient value in the owner's operation of its enterprise such that it provides an actual or potential advantage over others who do not possess the information. Restatement § 39 cmt. e, at 430.

RTC's president, Warren McShane, attests that

[t]he Advanced Technology is a source of substantial revenue for RTC in the form of licensing fees paid by Churches that are licensed to use the Advanced Technology. These Churches themselves receive a significant amount of their income from donations by parishioners for services based upon the Advanced Technology. These Churches pay RTC a percentage of the donations paid by parishioners for the services based upon the Advanced Technology. These donations and fees provide the majority of operating expenses of these various Church organizations.

McShane May 31, 1995 Decl. ¶ 16; *see also Vien*, 827 F.Supp. at 633 (finding Advanced Technology has value to Church by helping support its operations world-wide). The Church's need for revenues to support its services is no less because of its status as a religion. *Id.* (citing *Murdock v. Commonwealth of Pennsylvania*, 319 U.S. 105, 111, 63 S.Ct. 870, 874, 87 L.Ed. 1292 (1943)). RTC points out that it receives six percent of what the individual churches receive in licensing fees. J. Kobrin May 31, 1995 Decl, Ex. A ("McShane Depo."), at 43. This evidence is sufficient to establish the value of the Advanced Technology works to the Church.

▇▇▇▇ Erlich also argues that, to constitute a trade secret, information must give its owner a *competitive* advantage, which implies that the Church must have competitors, as it did in *Vien*. *See Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1011 n. 15, 104 S.Ct. 2862, 2877 n. 15, 81 L.Ed.2d 815 (1984); *ABBA Rubber Co. v. Seaquist*, 235 Cal. App.3d 1, 18, 286 Cal.Rptr. 518 (1991). Although Erlich is clearly not a "competitor" of the Church, there is no requirement that a trade secret have any value to the *defendant;* the value can be to *others* who do not possess it. Rest. § 39 cmt. e, at 430. The Church has admitted, however, that it currently has no "competitors." McShane Depo. at 95.

However, the definition of trade secret does not require that there *currently* be competitors, only that there be actual or *potential* value from the information being secret. Thus, potential competition is sufficient. *Id.* This evidence can be shown by direct evidence of the impact of the information on the business or by circumstantial evidence of the resources invested in producing the information, the precautions taken to protect its secrecy, and the willingness of others to pay for its access. Restatement § 39 cmt. e, at 431. The several past instances of breakaway Scientology-like groups exploiting RTC's Advanced Technology works for their profit constitute reasonable circumstantial evidence that these works give the Church a competitive advantage. *See* McShane Depo. at 93–94 (citing several former Church members who started rival factions); *Vien*, 827 F.Supp. at 634 (describing a rival faction); *Wollersheim*, 796 F.2d at 1078 (same). In fact, McShane's declaration constitutes direct evidence that the works have a significant impact on the donations received by the Church, providing a majority of its operating expenses. McShane May 31, 1995 Decl. ¶ 16. The status of the Advanced Technology works as trade secrets should not depend on Erlich's use of them. Accordingly, this court finds support for the court's conclusion in *Vien* that the Church has shown independent economic value.

### 3. Secrecy

▇▇▇▇ Information is protectable as a trade secret where the owner has taken "efforts that are *reasonable* under the circumstances to maintain its secrecy." UTSA § 3426.1(d)(2) (emphasis added). "Reasonable efforts" can include advising employees of the existence of a trade secret, limiting access to the information on a "need to know basis," *Courtesy Temporary Service, Inc. v. Camacho*, 222 Cal.App.3d 1278, 1288, 272 Cal.Rptr. 352 (1990), requiring employees to sign confidentiality agreements, *MAI Systems Corp. v. Peak Computer*, 991 F.2d 511, 521 (9th Cir.1993), and keeping secret documents under lock, 1 Milgrim § 1.04, at 1–126. *Accord* Restatement § 39 cmt. g, at 435. The court finds that RTC has put forward

sufficient evidence that it took steps that were reasonable under the circumstances to protect its purported trade secrets. RTC's president describes elaborate means taken to ensure the confidentiality of the Advanced Technology works, including use of locked cabinets, safes, logging and identification of the materials, availability of the materials at only a handful of sites worldwide, electronic sensors attached to documents, locked briefcases for transporting works, alarms, photo identifications, security personnel, and confidentiality agreements for all of those given access to the materials. McShane February 8, 1995 Decl. ¶¶ 13–18. McShane testifies that all copies of the Advanced Technology works that are outside of the Church were gained through improper means, such as by theft. *Id.* ¶¶ 22–24. Thirty-five other declarants confirm that the measures mentioned by McShane have been used, though not in exactly the same manner, in other Churches and at other times. *See e.g.,* Sydejko Decl. (describing measures used at Erlich's facilities during relevant time period); Byrne Decl. ¶ 15 (stating works have been kept confidential since at least 1968). There is further evidence that Erlich himself signed confidentiality agreements with respect to the Advanced Technology materials and, specifically, the upper-level "NOTS" course materials. *See* McShane February 8, 1995 Decl., Exs. H–I; McShane February 27, 1995 Decl., Exs. D–F; McShane Depo. at 201–03; H. Kobrin Mary 31, 1995 Decl., Ex. A ("Erlich Depo."), at 84–88. The court is unpersuaded by Erlich's claims that the Church's measures have not covered all locations where the Advanced Technology works are found and do not cover crucial time periods.[24] Efforts at maintaining secrecy need not be extreme, just reasonable under the circumstances. Legislative Committee Comment— Senate, Cal.Civ.Code § 3426.1, at 147 (West Supp.1995). The Church has made more than an adequate showing on this issue.[25]

■■■ Erlich raises a number of objections to the Church's claims of confidentiality. Erlich argues that the Church's trade secrets have been made available to the public through various means. The unprotected disclosure of a trade secret will cause the information to forfeit its trade secret status, since "[i]nformation that is generally known or readily ascertainable through proper means by others ... is not protectable as a trade secret." Restatement § 39 cmt. f, at 432; *see also* Cal.Civ.Code § 3426.1(d); *Kewanee Oil,* 416 U.S. at 484, 94 S.Ct. at 1887; *Chicago Lock Co. v. Fanberg,* 676 F.2d 400, 404 (9th Cir.1982); 1 Milgrim at 1–135. Once trade secrets have been exposed to the public, they cannot later be recalled. *In re Remington Arms Co.,* 952 F.2d 1029, 1033 (8th Cir.1991); *Smith,* 203 F.2d at 373.

■■ Erlich argues that many of the Advanced Technology documents have been available in open court records in another case, *Church of Scientology Int'l v. Fishman,* Case No. 91–6426 HLH (C.D.Cal.), destroying the necessary element of secrecy. *Cf. Lerma,* 897 F.Supp. at 262 (noting that some of Advanced Technology works were available in the court file in *Fishman* and that they were not subject to a sealing or protec-

**24.** In a declaration that was prepared in *Church of Scientology Int'l v. Fishman,* No. 91–6426 HLH (Tx), Erlich cites to books and articles by former Scientologists on the lack of security measures accompanying the study of the Advanced Technology materials. Erlich's Request for Judicial Notice, "Berger Decl.," Exs. 10, 22. This is clearly hearsay if offered to show the truth of the statements that the security measures were inadequate. The court nonetheless notes that the documents confirm that works were taken home in locked bags. *See id.,* Ex. 10, at 30.

**25.** The notion that the Church's trade secrets are disclosed to thousands of parishioners makes this a rather unusual trade secrets case. However, because parishioners are required to maintain the secrecy of the materials, McShane May 31, 1995 Decl. ¶ 3, the court sees no reason why the mere fact that many people have seen the information should negate the information's trade secret status. *See SmokEnders,* 184 U.S.P.Q. at 317 (citing *Chicago Board of Trade v. Christie G & S Co.,* 198 U.S. 236, 25 S.Ct. 637, 49 L.Ed. 1031 (1905)) ("A trade secret owner does not lose his right by communicating the results to persons; even if many, in confidential relations to itself, under a contract not to make public.") While it is logically more likely that a secret will leak out when more people are entrusted with it, absent evidence of leakage the court finds that giving out the secrets to a large number of people, though no more than necessary, is not itself an unreasonable security step.

tive order). However, the *Fishman* court recently issued an order sealing the file pending a decision on whether the documents are trade secrets. Even if those records were temporarily open to the public, the court will not assume that their contents have been generally disclosed, especially when this question is still pending before the district court in *Fishman*. Such a disclosure, without evidence that the secrets have become generally known, does not necessarily cause RTC to forfeit its trade secrets. *See Gates Rubber Co. v. Bando Chemical Industries, Ltd.*, 9 F.3d 823, 848–49 (10th Cir.1993) (finding that information retained its secret status despite being disclosed at hearing, where plaintiff evidenced continuing intent to maintain its secrecy by acting to seal the record). The contrary result would mean that if documents were ever filed without a sealing order, even for a short time, the court would not be able to decide that they should be sealed because the documents would have lost their potential trade secret status by virtue of the temporary unsealing. The only fair result would be to allow trade secret status for works that are otherwise protectable as trade secrets unless they were somehow made generally available to the public during the period they were unsealed, such as by publication.

 Erlich further asserts that the Advanced Technology has been largely disclosed in the popular press, as evidenced by various publications attached to the Berger Declaration, which was originally filed in the *Fishman* case.[26] These articles may reveal information referring to or hinting at the

trade secrets, but may not disclose the secrets themselves, *see* McShane May 31, 1995 Decl. ¶ 12 (cataloging what was disclosed by the Exhibits in *Fishman*).[27] However, as previously noted, the court is not certain how to properly define the "secrets." To the extent that someone uses or discloses any information taken from any of these articles, there is clearly no trade secret claim. However, much of Erlich's postings copied all or almost all of sections of the Advanced Technology works, which is far more than has ever been disclosed in the popular press. *See id.* ¶¶ 12–15. In fact, several of the works posted by Erlich are not mentioned in any of the clippings in the Berger declaration. *Id.* Arguably, the Church's alleged secrets are such that their value depends on the availability of the complete courses and not mere fragments, thus disclosures that describe parts of the works or disclose isolated portions do not necessarily suffice to ruin the value of the entire works as secrets. *Cf. SmokEnders*, 184 U.S.P.Q. at 317 (finding that secret's value can be from unified design including components that are individually in the public domain). However, without a clearer definition of what constitute the "secrets," the court is unable to determine whether some have been made generally known to the public.[28]

 Finally, Erlich newly emphasizes in his Reply that the works he posted were not secrets because he received them through proper means: eight of the documents were allegedly previously posted anonymously to a public portion of the Internet and one of the

26. Despite plaintiffs' argument to the contrary, these articles, several of which have been separately authenticated by Erlich's counsel, are not hearsay as they are being offered not for their truth but for the fact that they allegedly disclose to the public RTC's trade secrets.

27. Erlich further cites as relevant authority the Ninth Circuit's observations in its unpublished opinion regarding the confidentiality of the Advanced Technology works. *See Fishman*, 1994 WL 467999, 1994 U.S.App. LEXIS 23848 (9th Cir. Aug. 30, 1994). This court notes that the Ninth Circuit's Memorandum opinion is not to be cited, except where relevant under the doctrines of law of the case, res judicata, and collateral estoppel. Ninth Cir.Rule 36–3. It appears that none of the exceptions applies here. Fur-

ther, the Ninth Circuit made no findings as to the secrecy of the Advanced Technology works, but rather made "observations" that the district court might "wish to take into consideration" on remand. *Id.* 1994 WL 467999, at *3, 1994 U.S.App. LEXIS 23848, at *8.

28. There is no merit to Erlich's claim that the registration of the Advanced Technology works with the Copyright Office forfeited their trade secret status, as it appears that these works were registered in masked form. McShane May 31, 1995 Decl., Ex. A. There is likewise no merit to Erlich's argument that the Class VIII Assists lecture tape is not properly licensed to RTC and has not been kept confidential. *See* McShane Depo. at 134, 140; Byrne Decl. ¶¶ 7–14.

documents (item 1 of Exhibit B) allegedly came to Erlich anonymously through the U.S. mail. Erlich claims that because the alleged trade secrets were received from "public sources," they should lose their trade secret protection. Although the Internet is a new technology, it requires no great leap to conclude that because more than 25 million people could have accessed the newsgroup postings from which Erlich alleges he received the Exhibit B works, these works would lose their status as secrets. While the Internet has not reached the status where a temporary posting on a newsgroup is akin to publication in a major newspaper or on a television network, those with an interest in using the Church's trade secrets to compete with the Church are likely to look to the newsgroup. Thus, posting works to the Internet makes them "generally known" to the relevant people—the potential "competitors" of the Church.

■■■■ The court is troubled by the notion that any Internet user, including those using "anonymous remailers"[29] to protect their identity, can destroy valuable intellectual property rights by posting them over the Internet, especially given the fact that there is little opportunity to screen postings before they are made. *See* Eduardo M. Carreras, "Intellectual Property: First Casualty on the Information Highway," 13 No. 1 ACCA Docket 26 (Westlaw) ("Carreras") (Jan.–Feb. 1995) at *29–*32 (suggesting that trade secret protection is lost as soon as information is disclosed on the Internet). Nonetheless, one of the Internet's virtues, that it gives even the poorest individuals the power to publish to millions of readers, *see* Eugene Volokh, "Cheap Speech and What It Will Do," 104 Yale L.J. 1805, 1806–07 (1995), can also be a detriment to the value of intellectu-

al property rights. The anonymous (or judgment proof) defendant can permanently destroy valuable trade secrets, leaving no one to hold liable for the misappropriation. *See* Carreras at *30. Although a work posted to an Internet newsgroup remains accessible to the public for only a limited amount of time, once that trade secret has been released into the public domain there is no retrieving it. *In re Remington Arms*, 952 F.2d at 1033. While the court is persuaded by the Church's evidence that those who made the original postings likely gained the information through improper means, as no one outside the Church or without a duty of confidence would have had access to those works,[30] this does not negate the finding that, once posted, the works lost their secrecy. Although Erlich cannot rely on his own improper postings to support the argument that the Church's documents are no longer secrets, *see* 3 Milgrim § 15.01[1][a][ii], at 15–43, evidence that another individual has put the alleged trade secrets into the public domain prevents RTC from further enforcing its trade secret rights in those materials. Because there is no evidence that Erlich is a privy of any of the alleged original misappropriators, he is not equitably estopped from raising their previous public disclosures as a defense to his disclosure. *Underwater Storage, Inc. v. United States Rubber Co.*, 371 F.2d 950, 955 (D.C.Cir.1966), *cert. denied*, 386 U.S. 911, 87 S.Ct. 859, 17 L.Ed.2d 784 (1967) ("Once the secret is out, the rest of the world may well have a right to copy it at will; but this should not protect the misappropriator or his privies."). The court is thus convinced that those postings made by Erlich were of materials that were possibly already generally available to the public. *See Lerma*, 897 F.Supp. at 266 (finding that RTC could not show the

---

29. *See* Trotter Hardy, "The Proper Legal Regime for 'Cyberspace'," 55 U.Pitt.L.Rev. 993, 1055 n. 45 (Summer 1994) (noting that "anonymous remailer" exists in Finland to allow anonymous or pseudonymous use of the Internet).

30. *See, e.g.*, McShane May 31, 1995 Decl. ¶ 10. In another case involving some of the same Advanced Technology works, the court found misappropriation of trade secrets where the works were stolen from a Church in Denmark and the defendant's copies must have been connected to the stolen documents, thereby defeating the de-

fendant's argument that he had acquired the information through proper means. *Religious Technology Center v. Wollersheim*, 228 U.S.P.Q. 534, 536–37, 1985 WL 72663 (C.D.Cal.1985), *rev'd on other grounds*, 796 F.2d 1076 (9th Cir. 1986). The present case is distinguishable because there was no argument in *Wollersheim* that the defendants had received the Church materials in a manner that would destroy their secrecy, i.e., over the Internet or by some other type of publication.

Advanced Technology works were not "generally known" to support injunctive relief); *F.A.C.T.NET*, 901 F.Supp. at 1527 (same). Therefore, RTC has not shown a likelihood of success on an essential element of its trade secret claim.[31]

#### 4. Conclusion and Alternative Test

Because RTC is the plaintiff, and because it is moving for injunctive relief, it bears the burden of proving its trade secrets. 3 Milgrim § 15.01[1]. The court finds that RTC has failed to adequately define its trade secrets and, at least as to those works that have been made available to the public through previous Internet postings not by Erlich, RTC has failed to meet its burden on the issue of secrecy. Therefore, RTC has failed to show a likelihood of success on its trade secret misappropriation claim.

RTC's failure to prove a likelihood of success on its trade secret claim of secrecy does not necessarily preclude it from showing an entitlement to a preliminary injunction. RTC can meet the second formulation of the preliminary injunction test by showing a combination of serious questions going to the merits of its trade secret claim and that the balance of hardships tips in its favor. However, since the trade secrets have not been adequately defined, the court cannot find that serious questions going to the merits have been sufficiently raised to justify a pre-liminary injunction on the trade secret claim. Until RTC better describes what its trade secrets are, it is impossible to determine whether previous public disclosures of parts of the Advanced Technology works are sufficient to destroy the secrecy of the entire work. While *parts* of many of the works have been mentioned in various published articles and books, the court is unclear what effect such disclosures would have on the secrecy and value of an *entire* work. The court is also not entirely persuaded by RTC's argument that its secrets have competitive value to future breakaway groups. These issues will have to be resolved before RTC can ultimately prevail on its trade secret claims.

#### D. Irreparable Injury and Balance of Hardships

The court will presume irreparable harm for the copyright claim because plaintiffs have shown a likelihood of success on their claims of infringement. *Johnson Controls, Inc. v. Phoenix Control Systems, Inc.*, 886 F.2d 1173, 1174 (9th Cir.1989); *Apple Computer, Inc. v. Formula International, Inc.*, 725 F.2d 521 (9th Cir.1984).

#### E. First Amendment Concerns

■ In his Reply, Erlich argues that there is a strong presumption against any

---

**31.** Although Erlich does not specifically address the element of misappropriation, the court notes that RTC has shown that Erlich's disclosures over the Internet of RTC's Exhibit B works, like that of the defendant in *Vien*, may constitute misappropriation. The fact that Erlich's postings were not of the "entire secret," and included only portions of courses, does not mean that Erlich's disclosures are not misappropriations. While previous partial disclosures arguably made public only those parts disclosed, Erlich's partial disclosures of non-public portions of the secrets may themselves be actionable because they constitute "disclosure ... without ... consent by a person who ... knew or had reason to know that his ... knowledge of the trade secret was ... [either] [d]erived from or through a person who had utilized improper means to acquire it [or] [a]cquired under circumstances giving rise to a duty to maintain its secrecy or limit its use." UTSA § 3426.1(b).

Erlich argues that this case is distinguishable from *Vien* because in *Vien* the defendant was "a competitor of plaintiffs' [sic], who used the Ad-vanced Technology in the delivery of the courses for which she [was] paid" and for which she charged as much as $3000. *Vien*, 827 F.Supp. at 633–34 (emphasis added). Unlike the defendant in *Vien*, Erlich neither offers Scientology-like services nor charges anyone for the use of the materials. Additionally, Erlich seems to argue that his activities are distinguishable from those of the defendants in *Vien* and *Wollersheim* because he never profited from his use of the trade secrets and thus has not misappropriated the works. However, nothing in the UTSA requires that the defendant gain any advantage from the disclosure; it is sufficient to show "use" by disclosure of a trade secret with actual or constructive knowledge that the secret was acquired under circumstances giving rise to a duty to maintain its secrecy. UTSA § 3426.1(b)(2); *Ashton–Tate Corp. v. Ross*, 916 F.2d 516, 523–24 (9th Cir.1990). Thus, Erlich's admitted posting of the information, regardless of any alleged fair use defense or lack of financial motive may constitute misappropriation of the Church's trade secrets.

injunction that could act as a "prior restraint" on free speech, citing *CBS, Inc. v. Davis*, —— U.S. ——, —————, 114 S.Ct. 912, 913–14, 127 L.Ed.2d 358 (1994) (Justice Blackmun, as Circuit Justice, staying a preliminary injunction prohibiting CBS from airing footage from inside meat packing plant). The court notes, however, that the 1976 Act explicitly sanctions the use of preliminary injunctions in the case of copyright infringement. 17 U.S.C. §§ 501(a), 502(a). The Supreme Court has recognized that the Copyright Act itself embodies a balance between the rights of copyright holders, guaranteed by the Constitution, U.S. Const. art. I, § 8, and the protections of the First Amendment. *See Harper & Row*, 471 U.S. at 557–60, 105 S.Ct. at 2229–30; *In re Capital Cities/ABC, Inc*, 918 F.2d 140, 143–44 (11th Cir.1990). The doctrine of fair use already considers First Amendment concerns. *New Era Publications International, ApS v. Henry Holt & Co.*, 873 F.2d 576, 584 (2d Cir.1989), *cert. denied*, 493 U.S. 1094, 110 S.Ct. 1168, 107 L.Ed.2d 1071 (1990) (rejecting defendant's argument that First Amendment concerns precluded granting an injunction, though finding other equitable considerations dictated denial of injunctive relief). Because Erlich is able to continue to criticize the Church and use its published and unpublished works to the extent allowed by the doctrine of fair use and because the injunctive relief sought is no broader than necessary to protect plaintiffs' copyrights, Erlich's First Amendment interests have been adequately considered.

### F. Conclusion

■■■■■■ Plaintiffs have shown a likelihood of success on the merits of their copyright claims except as to item 4 of Exhibit A, for which the copyright has expired. Plaintiffs gain the benefit of a presumption of irreparable harm as to this claim. Accordingly, plaintiffs are entitled to a preliminary injunction prohibiting any further copying of plaintiffs' copyrighted Exhibit A and B works pending a trial on the merits, except as to item 4 of Exhibit A and as allowed by the

doctrine of fair use.[32] Under the fair use doctrine, Erlich may post, or otherwise publish, his criticism of the Church, using plaintiffs' copyrighted Exhibit A and B works to the extent necessary to carry out his critical purpose. However, the court notes that copying the works in their entirety with very little added criticism is almost certainly not fair use.

Accordingly, the court grants in part and denies in part plaintiffs' application for a preliminary injunction and Erlich's motion to dissolve the TRO.

### III. PLAINTIFFS' APPLICATION To EXPAND THE TRO

■■■ Plaintiffs have applied to expand the scope of the preliminary injunction against Erlich to include more of plaintiffs' works that are allegedly protected by copyright and trade secret law, beyond those listed in Exhibits A and B of the FAC. This request comes after plaintiffs maintain that Erlich violated a promise he made to the court to convince it to continue the contempt hearing. On March 14, 1995, counsel for Erlich stated that Erlich "would agree not to publish any of Mr. Ron Hubbard's writings, or copyright-registered writings of the Church of Scientology, until the contempt hearing." *See* March 16, 1995 Order Setting Hearing Dates. Plaintiffs seek to expand the number of documents covered by the injunction to include 52 works because Erlich allegedly "furnished a copy of another copyrighted, confidential work, taken from the same course as the document which he posted in his first violation of the TRO, to a litigant in another lawsuit." Ex Parte App. for Amended TRO at 4. However, plaintiffs have not provided Erlich or the court with the registrations for these materials to allow a determination that they are the subject of valid copyright interests. The scope of this case should not be expanded to encompass all or a large number of Hubbard's copyrighted works merely because Erlich made a promise to allow the postponement of the contempt hearing. Now that there has been a contempt hearing, and

---

**32.** Although there is no evidence that Erlich "copied" item 9 of Exhibits A and B, the court is satisfied that plaintiffs have shown the document to be protectable and of the same nature as other

Exhibit A and B documents. Therefore, it is reasonable to include those documents in the injunction.

given the court's finding that Erlich was not in contempt, *see* part IV *infra*, the court does not believe that an overly expansive preliminary injunction is appropriate. In fact, a broad injunction which goes beyond the scope of the allegedly infringing activities should be avoided for First Amendment reasons. *See* 3 Nimmer § 14.06[C], at 14–106 to –109 (noting that scope of injunction should be coterminous with, and no broader than, infringement); *In re Capital Cities/ABC, Inc.*, 918 F.2d at 144 (calling for a "surgical" restraint to accommodate First Amendment rights). Accordingly, the court denies plaintiffs' application for an expansion of the injunctive relief.[33]

### Request To Seize Erlich's Computer

 The court finds plaintiffs' request that Erlich's computer and other equipment be seized to be wholly without merit. No amount of excessive copying in the context of criticism, which is potentially subject to a valid fair use defense, would warrant such a seizure. Here, Erlich's equipment is hardly an instrument of infringement. Rather, it is essential to the operation of his business and other affairs. While a specifically-tailored injunction in a copyright case does not offend the First Amendment, attempting to shut down a critic's speech activities, including those that do not implicate the copyright laws in the least, would constitute an unwarranted prior restraint on speech. *Cf.* 3 Nimmer § 14.06[C], at 14–107 to –109; *RCA Records v. All–Fast Systems, Inc.*, 594 F.Supp. 335, 340 (S.D.N.Y.1984) (where action not against record pirates, court should not seize equipment which can be used for non-infringing purposes).

### IV. MOTION FOR CONTEMPT

The Ninth Circuit set forth the standards for civil contempt in *In re Dual–Deck Video Cassette Antitrust Litigation*, 10 F.3d 693 (9th Cir.1993):

> Civil contempt in this context consists of a party's disobedience to a specific and definite court order by failure to take all reasonable steps within the party's power to comply. The contempt "need not be willful," and there is no good faith exception to the requirement of obedience to a court order. But a person should not be held in contempt if his action " 'appears to be based on a good faith and reasonable interpretation of the [court's order].' " "Substantial compliance" with the court order is a defense to civil contempt, and is not vitiated by "a few technical violations" where every reasonable effort has been made to comply.
>
> The party alleging civil contempt must demonstrate that the alleged contemnor violated the court's order by "clear and convincing evidence," not merely a preponderance of the evidence. . . .
>
> This set of rules is easy to articulate but difficult to apply. [The court must properly determine] (1) that [plaintiff] violated the court order, (2) beyond substantial compliance, (3) not based on a good faith and reasonable interpretation of the order, (4) by clear and convincing evidence.

*Id.* at 695 (citations omitted). Plaintiffs allege that Erlich has violated the terms of the Amended TRO on three separate occasions.

### A. First Alleged Contempt

 First, plaintiffs allege that Erlich was in contempt of this court's February 10, 1995 TRO or its February 23, 1995 Amended TRO when, on February 26, 1995, Erlich posted portions of item 1 of Exhibit B, the Class VIII "Assists" tape transcript ("the Assists transcript"). Erlich contends that he had not received the court's Amended TRO at the time he made the posting. At the time of the posting, Erlich was not yet represented by counsel. The court's original TRO enjoined Erlich from making certain uses of the Exhibit A and B works, but did not make clear that Erlich could make fair use of the non-trade secret Exhibit A works. From the content of Erlich's posting, it seems that

---

33. This conclusion, however, is without prejudice to plaintiffs' filing a request for leave to file a supplemental complaint that contains further allegations of infringement of copyright or to request that the preliminary injunction be expanded to cover works which were seized from Erlich and are now being returned. The application would need to show that plaintiffs hold valid copyright interests in the documents.

Erlich thought he was engaging in fair use of the Assists transcript. While the court did not explicitly indicate that Erlich could make "fair use" of any of the unpublished, confidential Exhibit B works at the February 21, 1995 hearing, the court indicated that its Amended TRO would "prohibit any publication of confidential matter or any publication of copyrighted matter that was not that which is fair criticism or comment or fair use." Erlich's March 15, 1995 Opp'n, Ex. A, Tr. 30–31. Erlich may have reasonably misconstrued this language so that he believed the exception for fair use also modified the first clause, "prohibit[ing] any publication of confidential matter," especially given Erlich's *pro se* status at the hearing. Accordingly, the court does not find that plaintiffs have shown by clear and convincing evidence that Erlich's mistake was not a "good faith and reasonable interpretation of the [court's oral] order." *In re Dual–Deck Video Cassette Antitrust Litigation,* 10 F.3d at 695. Although the court is not convinced that Erlich's use of the Exhibit B works, to which the fair use defense would not have applied at the time, was in any case a fair use, the defense was not adequately explained in the context of the hearing such that Erlich's violation could be considered a violation of a "specific and definite" court order. *See id.*

## B. Second Alleged Contempt

Plaintiffs allege that Erlich provided copies of one of Hubbard's Advanced Technology writings to another litigant to be used in a declaration. As the court found in its May 5, 1995 "Order Denying Plaintiffs' Ex Parte Application To Shorten Time re Contempt Hearing," plaintiffs have not demonstrated how Erlich has clearly violated the Amended TRO, which prohibited certain uses of the Exhibits to the complaint, by attaching to a declaration a work not listed in the Exhibits to the complaint but merely "related to" one

of those works. Plaintiffs have submitted no new evidence on this issue that would lead the court to change its earlier ruling.

## C. Third Alleged Contempt

Third, plaintiffs allege that on May 15, 1995, an interview of Erlich appeared on a BBC television show which contained a segment related to this case. Plaintiffs have attached a declaration stating that plaintiffs believe Erlich disclosed information "taken right out of" one part of the Advanced Technology listed in Exhibit B–1 [34] to the First Amended Complaint. Erlich disputes that he disclosed any portion of the Exhibit B works on the British television show, and argues that the information he disclosed is already widely available to the public, as evidenced by several articles in newspapers and magazines. Erlich further objects to the declaration of Warren McShane offered by plaintiffs, as it lacks foundation for the content of the BBC interview. Even accepting the validity of McShane's declaration regarding what was disclosed on the BBC show, the court finds that plaintiffs have failed to prove by clear and convincing evidence that Erlich in fact disclosed any of the Exhibit B works which were the subject of the Amended TRO. To the extent that Erlich's extremely brief statement relating to the Advanced Technology discloses information from one of those works, the court further finds that Erlich stated nothing more than has appeared in numerous newspaper and magazine articles and books about the Church. *See, e.g.,* Joel Sappell & Robert W. Welkos, "The Man Behind the Religion" *L.A. Times,* June 24, 1990, at A36, Oakley May 31, 1995 Decl., Ex. C, at 81.

## V. ERLICH'S MOTION TO VACATE WRIT OF SEIZURE

Erlich challenges the February 10, 1995 writ of seizure [35] on the grounds that it was

---

**34.** Exhibits A and B, and not Exhibits A–1 and B–1 to the FAC, are the subject of the TRO and the Amended TRO.

**35.** The writ of seizure provides in relevant part:
TO THE UNITED STATES MARSHAL OR OTHER LAW ENFORCEMENT OFFICERS:
 Pursuant to the Order [of February 10, 1995 to Clerk To Issue Writ for Seizure of Articles

Infringing Statutory Copyright], which commands me to issue this Writ of Seizure,
 YOU ARE DIRECTED to seize, using such force as may be reasonably necessary in the premises, the following articles and things which you may then or otherwise thereafter find on the person, in the possession, or under the control of defendant Dennis Erlich ("Er-

not authorized under the Federal Rules and that it is unconstitutionally overbroad. Erlich seeks the vacation of the writ of seizure, the return of all materials seized, and an increase in the amount of the bond.

Erlich argues that the writ of seizure is invalid because plaintiffs did not comply with the requirements of Rule 65(b) of the Federal Rules of Civil Procedure. Plaintiffs respond that the seizure was authorized by the Supreme Court's Copyright Rules, which provide for a summary process of seizure separate from the Federal Rules. Plaintiffs further argue that, even if Rule 65(b) applies, its requirements were met prior to the issuance of the writ.

## A. Supreme Court's Copyright Rules

■ The 1976 Act provides for the impoundment of allegedly infringing articles:

> At any time while an action under this title is pending, the court *may* order the impounding, on such terms as it deems reasonable, of all copies ... claimed to have been made or used in violation of the copyright owner's exclusive rights, and of all plates, molds, matrices, masters, tapes, film negatives, or other articles by means of which such copies ... may be reproduced.

17 U.S.C. § 503(a) (emphasis added). Unlike the 1909 Act, the 1976 Act gives the court discretion whether to issue an impounding order. 3 Nimmer § 14.07, at 14–112.

In 1909, the Supreme Court issued Copyright Rules ("Rules"), pursuant to section 25(e) of the 1909 Act, setting forth procedures for seizure and impoundment. *See* 17 U.S.C. foll. § 501. The Rules allow the clerk of the court to summarily issue a writ of seizure of allegedly infringing articles without requiring any preseizure notice or hear-

ing. *Paramount Pictures Corp. v. Doe*, 821 F.Supp. 82, 86 (E.D.N.Y.1993); 3 Nimmer § 14.07, at 14–113 to –114. Although neither the Supreme Court nor the 1976 Act explicitly repealed the Copyright Rules, *Warner Bros. Inc. v. Dae Rim Trading, Inc.*, 877 F.2d 1120, 1124 (2d Cir.1989), courts and commentators have questioned the Rules' continuing validity, both as a matter of statutory construction and constitutional law. *See WPOW, Inc. v. MRLJ Enterprises*, 584 F.Supp. 132, 134–35 (D.D.C.1984) (rejecting continuing validity of Rules based on added discretion in 1976 Act which is inconsistent with summary and mandatory procedure of Rules); *Paramount*, 821 F.Supp. at 87–91 & n. 4 (finding provisions of Rules "clearly inconsistent with the discretionary powers" of the 1976 Act, noting that the 1976 Act "arguably supersedes and renders null and void" the Rules, and holding that Rules run afoul of Fourth and Fifth Amendments); *Van Deurzen & Assoc. v. Sanders*, 21 U.S.P.Q.2d 1480, 1991 WL 183817 (D.Kan.1991); 3 Nimmer § 14.07, at 14–115 to –119 (noting that Rules' ex parte proceedings are subject to "serious question" as to whether they violate free speech, due process, and freedom from unreasonable searches and seizures); *cf. First Technology Safety Systems, Inc. v. Depinet*, 11 F.3d 641, 648–49 & n. 8 (6th Cir.1993) (noting debate regarding sufficiency of compliance with Rules and applying Fed.R.Civ.P. 65(b) where seizure not authorized by Rules).

Plaintiffs cite *Duchess Music Corp. v. Stern*, 458 F.2d 1305 (9th Cir.), *cert. denied sub nom. Rosner v. Duchess Music Corp.*, 409 U.S. 847, 93 S.Ct. 52, 34 L.Ed.2d 88 (1972) to support their position that the Rules still permit a summary procedure for the ex parte granting of writs of seizure. In *Duchess*, the Ninth Circuit reversed the dis-

---

lich") and/or defendant's agents and persons acting in concert with defendant, at [defendant's home address], or elsewhere where defendant Erlich or any such agents and persons may be found in the territory in which you may serve this Writ, including any building, annex or other structure adjacent to or on the premises identified above, to wit: <u>any and all copies, reproductions, or embodiments of all or any part of the literary works identified on Exhibits A and B to the Complaint</u> (copies of

Exhibits A and B are attached hereto), including any 3½″ or 5¼″ computer disks and printed materials; all masters and tapes; <u>any articles and things that appear to be works of L. Ron Hubbard protected by copyrights;</u> but excluding all personal computers (including all ancillary equipment and disk drives, found at or within the above-described locations[ ) ].

February 10, 1995 Writ of Seizure (emphasis added).

trict court's order that certain seized items be returned, holding that "[n]either the [1909 Act] nor the Supreme Court rules give the District Court any discretion to determine what to impound" and that the "process Congress granted the aggrieved copyright proprietor is a summary one." *Id.* at 1308. Given the discretionary language of the 1976 Act, and the expansion of the Fifth Amendment in cases such as *Mitchell v. W.T. Grant Co.*, 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974), the court finds plaintiffs' reliance on the Copyright Rules and *Duchess* to be misplaced. Instead, the court finds persuasive the reasoning of the courts in *Paramount* and *WPOW* questioning the current validity of the summary process approved by the 1909 Act and Supreme Court Rules and requiring plaintiffs to meet the requirements of Rule 65(b) of the Federal Rules of Civil Procedure.

### B. Requirements of Rule 65(b)

Rule 65(b) provides that ex parte injunctive relief will be granted

only if (1) it clearly appears from specific facts shown by affidavit or by the verified complaint that *immediate and irreparable injury*, loss, or damage will result to the applicant before the adverse party or that party's attorney can be heard in opposition, and (2) the applicant's attorney certifies to the court in writing the ... *reasons supporting the claim that notice should not be required.*

Fed.R.Civ.P. 65(b) (emphasis added).

#### 1. Irreparable Injury

 In their ex parte applications for relief, plaintiffs argued that interim injunctive relief was necessary because Erlich had repeatedly infringed plaintiffs' copyrighted works, even after being warned by plaintiffs. In his deposition, McShane testified that plaintiffs would suffer injury from Erlich's unauthorized posting of plaintiffs' works because "if people read those documents they're not supposed to, and if that affects them from ever doing the service, stops them

from doing the service, obviously they won't make donations to the church which will directly affect RTC economically." Oakley Reply Decl., Ex. B, at 112. McShane also stated that he was "quite concerned that [Erlich] will continue to defy requests to cease infringement even if ordered to do so by the Court. Mr. Erlich has already placed multiple copyrighted works, including several that are confidential, onto a massive computer network potentially accessed by 25 million people." McShane February 8, 1995 Decl. ¶ 56. The court finds this evidence sufficient to establish a likelihood that, absent a writ of seizure, Erlich would have continued to post plaintiffs' copyrighted works prior to a hearing. Such a likelihood of further infringement before Erlich could respond, combined with a reasonable likelihood of success on the copyright infringement claim, allows the court to presume irreparable injury. *See Apple,* 725 F.2d at 525 (holding that reasonable likelihood of success of copyright infringement claim allows presumption of irreparable injury); *WPOW,* 584 F.Supp. at 138 (allowing presumption in context of impoundment).

#### 2. Reasons Why Notice Should Not Be Required

 The second element of Rule 65(b) permits injunctive relief without notice only where notice to the adverse party is impossible or, in some limited circumstances, where notice would render further action fruitless. *First Technology,* 11 F.3d at 650. Plaintiffs may meet the latter exception to the notice requirement by showing that Erlich "would have disregarded a direct court order and disposed of the goods within the time it would take for a hearing." *Id.;* 3 Nimmer § 14.07, at 14–115. This may be shown with evidence of a defendant's history of violating court orders or destroying evidence, such as in the case of a member of a counterfeiting ring who, if given notice, would simply transfer his inventories to another member of the ring.[36] *Id.; In re Vuitton et Fils S.A.,* 606

---

**36.** Although Erlich's use of plaintiffs' materials for what is arguably criticism can hardly be analogized to the case of a professional counterfeiter, other considerations make this a good case

for ex parte relief. Computer files can be easily uploaded and copied from one location to another and are easy to transport, conceal, or delete. The ability of users to post large amounts of

F.2d 1, 4–5 (2d Cir.1979). Plaintiffs provide evidence of the need for a pre-notice seizure: Erlich stated that the decision whether to stop posting Scientology works was his and that "[n]o local government or court in the [U.S.] has the power to tell [him] otherwise." FAC, Ex. J. Although the court was persuaded at the time of its seizure order that this evidence indicated that there was a chance that Erlich would not follow a court order, the court has reconsidered its original conclusion. Erlich's statement of defiance, made in the context of an exchange of hostile letters between the parties, does not rise to the level necessary to meet Rule 65(b)'s demanding requirements for dispensing with notice. Further, other than this isolated statement, there was no evidence of Erlich's propensity to defy a court order. The court does not find that this case is analogous to that of a counterfeiter who, if given notice, might transfer the infringing works elsewhere. Erlich is not "engaged primarily in illegitimate and infringing activities and [is thus not] likely to disregard an order from [the court] preventing [him] from disposing of or destroying any [evidence of infringement]." *Paramount,* 821 F.Supp. at 89. The court further notes that plaintiffs already had evidence of Erlich's infringing copies in the form of the newsgroup postings, thereby reducing the importance of preserving other evidence of infringement. Because there was an insufficient showing under Rule 65(b) to support a writ of seizure, the writ must be vacated.[37]

## C. Unconstitutionally Overbroad?

■ Although the court has found that the requirements of Rule 65(b) were not sufficiently met, the court further notes that one aspect of the order was overbroad. "It is well settled that the Fourth Amendment prohibition against unreasonable intrusions ... governs not only criminal investigations but also searches and seizures made pursu-

ant to civil proceedings," *Paramount,* 821 F.Supp. at 90 (citing *Soldal v. Cook County, Ill.,* 506 U.S. 56, 66–67 & n. 10, 113 S.Ct. 538, 546 & n. 10, 121 L.Ed.2d 450 (1992)), including "seizure orders directing the United States Marshal to impound allegedly infringing articles under the Copyright Act," *id.* (citing *Warner Bros., Inc. v. Dae Rim Trading, Inc.,* 677 F.Supp. 740, 765 (S.D.N.Y. 1988), *aff'd in part, rev'd in part on other grounds,* 877 F.2d 1120 (2d Cir.1989)). To comply with the requirements of the Fourth Amendment, a writ of seizure should specify with particularity the premises to be searched and the articles to be seized. *Id.* The scope of the search must thus be limited by "the object of the search and the places in which there has been a showing that the object is likely to be found." *Id.* (citing *Maryland v. Garrison,* 480 U.S. 79, 84, 107 S.Ct. 1013, 1016, 94 L.Ed.2d 72 (1987)). The order should "enable the executing officer to ascertain and identify with reasonable certainty those items that the [court] has authorized him to seize." *Time Warner Entertainment Co. v. Does,* 876 F.Supp. 407, 413 (E.D.N.Y.1994) (citing *United States v. George,* 975 F.2d 72, 75 (2d Cir.1992)).

■ The purpose of preliminary injunctive relief is to maintain the status quo. Impoundment is also meant to allow for a possible remedy of destruction of the infringing articles. 3 Nimmer § 14.07, at 14–119. To the extent that the order allowed the seizure of "articles and things that appear to be works of L. Ron Hubbard protected by copyrights," it went beyond the purpose of the Copyright Act to prevent the unauthorized "reproduction" of protected works; the mere possession of copyrighted works does not offend the Copyright Act. This language is also somewhat vague, as it describes a category of works which cannot be identified by any easy to apply criteria. The criteria used to determine what items are to be seized

protected works nearly instantaneously over the Internet makes it a rather dangerous haven for copyright infringers.

**37.** Plaintiffs allege that Erlich has shown his propensity to conceal evidence and lie by his concealment of the computer containing the infringing materials in a closet in a locked room

during the February 13, 1995 seizure. This evidence, which Erlich disputes, is irrelevant to the question of what evidence presented to the court prior to the issuance of the ex parte seizure order showed that the court should dispense with the usual notice requirement. *See First Technology,* 11 F.3d at 651–52.

must not be overly subjective, such that the decision of what to seize rests solely in the hands of plaintiffs' expert rather than the U.S. Marshal. *Paramount,* 821 F.Supp. at 91 (finding application constitutionally deficient where only some of distinguishing markings for identifying unauthorized videocassettes were listed in plaintiffs' application); *Time Warner,* 876 F.Supp. at 413 (finding plaintiffs' application insufficient where murky photocopies of copyrighted designs and trademarks provided insufficient guidance to marshal). Here, there were no specific criteria given by which a marshal could identify which works were written by Hubbard and were protected by copyrights. In effect, this language gave plaintiffs' experts the authority to search through Erlich's possessions and computer files using their discretion in deciding what to seize, unchecked by any law enforcement officials.

▐ Plaintiffs contend, however, that its use of a computer expert to enable the search of materials on Erlich's computers and an expert in the works of Scientology to enable the identification of plaintiffs' works was justified, citing a criminal case, *State v. Wade,* 544 So.2d 1028, 1030–31 (Fla.Dist.Ct. App.1989). In *Wade,* the Florida appellate court upheld a search for stolen computer equipment where law enforcement officers were aided by computer consultants employed by the victim computer manufacturer. *Id.* The *Wade* court reasoned that searches in areas beyond law enforcement officers' expertise necessitate the use of experts and noted that the employees of the victim are perhaps the best experts to identify the allegedly stolen equipment. *Id.* at 1030 (citing 2 Wayne R. LaFave, *Search & Seizure* § 4.11(b), at 343 (1987) (commenting that practice of using victims to help advise in search is unobjectionable in exceptional situations such as where only the victim can adequately identify what items are stolen)).[38] The court finds that, in the context of identification of allegedly infringing copies of literary works, use of an expert to *aid* the marshal may be justified. In this case, the number of potentially infringed works was too great to permit the plaintiffs to bring originals to be used in verifying the source of copies. Accordingly, plaintiffs were justified in using an expert to identify the allegedly infringing works. Similarly, because the allegedly infringing copies were likely to be stored on a computer, the use of computer experts was justified to aid in finding the materials.[39] *See Wade,* 544 So.2d at 1030; *cf.* Oakley Reply Decl., Ex. C, at 200 (Erlich Depo.) (indicating that police officers at seizure were not computer literate).

However, such works should have been adequately identified before the seizure to "ensure[ ] that the search [would] be carefully tailored to its justifications and [would] not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit." *Paramount,* 821 F.Supp. at 90 (quoting *Garrison,* 480 U.S. at 84, 107 S.Ct. at 1016). The inclusion of language allowing the seizure of "any articles and things appearing to be works of L. Ron Hubbard protected by copyrights" arguably made the writ overbroad, giving RTC officials too much discretion in identifying Hubbard works and in determining which works were subject to copyright protection and which copies were unauthorized. In effect, plaintiffs' agents were given the authority to seize even lawfully owned copies of Hubbard's works for which there was no evidence of any infringing use, which exceeds the authority of 17 U.S.C. § 503(a).

---

**38.** The cases cited by plaintiffs for the proposition that a very broad seizure is justified are not on point. The extremely broad searches and seizures in those cases were justified because of the pervasiveness of the crime or fraud.

**39.** The court is disturbed by the possibility that plaintiffs copied the entirety of Erlich's hard drive onto a tape for examination at their leisure. If Erlich did not, as he claims, consent to this part of the seizure, this would constitute a signifi-

cant intrusion into Erlich's private affairs that was not justified by the need to identify infringing copies. *But see* McShane February 21, 1995 Decl. ¶ 7 (stating that Erlich consented to plaintiffs' reviewing his floppy disks off the premises if the non-infringing disks were returned). The court is also disturbed by allegations that plaintiffs deleted materials from Erlich's hard drive if such materials were not also saved on floppies or tape back-up for possible later restoration.

### D. Conclusion

Because plaintiffs' ex parte application for a writ of seizure did not meet the requirements of Rule 65(b), the court vacates the writ. Plaintiffs must return to Erlich all articles seized within ten (10) days of this order.[40]

### VI. PLAINTIFFS' REQUEST FOR SANCTIONS AGAINST CARLA OAKLEY

The court is disturbed by the parties' seemingly endless applications to the court, consolidated oppositions, sur-replies, objections to sur-replies, and other such inappropriate pleadings. In their objections to Erlich's "Consolidated Opposition to Plaintiffs' Ex Parte Applications," plaintiffs request that Erlich's counsel, Ms. Carla Oakley, be sanctioned under Rule 11 of the Federal Rules of Civil Procedure and 28 U.S.C. § 1927 for filing "frivolous" pleadings which multiply the proceedings "unreasonably and vexatiously."

To the extent that the Consolidated Opposition contains new arguments, the court finds that these arguments are necessary to address plaintiffs' multiple ex parte applications alleging three different instances of contempt. Erlich's sur-reply to the motion to expand the TRO was arguably justified by plaintiffs' mention of a new instance of alleged contempt for the first time in their Reply.[41] The court therefore denies plaintiffs' requests for sanctions. Plaintiffs' request that the court strike the arguments in the Consolidated Opposition because they are merely repetitive arguments that were "cut and past[ed]" from previous briefs is unnecessary to the extent that the briefs add nothing new. However, the court orders that the parties not file any further post-Reply briefing, which only wastes the court's and parties' resources, without first seeking leave of the court. *See* Civil L.R. 7–3(e). The court further rejects plaintiffs' claim that Erlich's "Consolidated Opposition" reveals alleged trade secrets from plaintiffs' Advanced Technology works, and should have been filed under seal. Nothing in the "Consolidated Opposition" reveals information not already publicized in the popular press. *See supra* part IV.C.

### VII. ORDER

For the reasons set forth above, the court orders as follows:

1. Defendant Dennis Erlich and his agents, servants, and employees, all persons acting or purporting to act under his authority, direction or control, and all persons acting in concert or in participation with any of them who receive notice of this Order, shall be and are restrained and enjoined pending further court order:

 a. From all unauthorized reproduction, transmission, and publication of any of the works of L. Ron Hubbard that are protected under the Copyright Act of 1976, as codified in its amended form at 17 U.S.C. § 101 et seq. Such works are found, for the purposes of this order only, to be those works identified in Exhibits A and B to the complaint, except for item 4 of Exhibit A. A copy of said exhibits are attached hereto with item 4 of Exhibit A redacted.

 i. Unauthorized reproduction, transmission, or publication includes placement of a copyrighted work into a computer's hard drive or other storage device; "browsing" the text of a copyrighted work resident on another computer through on-screen examination; scanning a copyrighted work into a digital file; "uploading" a digital

---

40. Erlich's additional arguments are mooted by the court's conclusion. The court has already disposed of Erlich's argument that plaintiffs' failure to prove likelihood of success on the merits and irreparable harm is an independent ground for vacating the writ of seizure. Because the court has determined that the writ of seizure should be vacated, there is no need to consider Erlich's request to increase the amount of the bond. Erlich's request for the return of certain improperly seized articles is also moot as all materials must be returned.

41. The court notes that plaintiffs are not alone in placing new arguments in their Reply—Erlich's Reply in support of his motion to dissolve the TRO contained several new arguments. The proper response to such new arguments, however, would be to object to the new arguments, not to endlessly continue the arguments back and forth.

file containing a copyrighted work from the computer to a bulletin board system or other server; "downloading" a digital file containing a copyrighted work from a bulletin board system or other server to the computer; and "quoting" a copyrighted work that is cited in an on-line message in sending, responding to or forwarding that message.

ii. Nothing in this section of the order shall be construed to prohibit fair use of such works, as set forth in 17 U.S.C. § 107 and interpreted by applicable case law. Fair use of the copyrighted material for the purposes of this order includes use of the copyrighted work for the purpose of criticism, news reporting, teaching, scholarship, and research but does not include: (1) use of the material for a commercial purpose where the user stands to profit from exploitation of the copyrighted material without paying the customary price or giving the usual consideration or use that would have a significant effect on the potential market value of the copyrighted work; (2) use which fulfills the demand for the original work; or (3) use of the heart of the work—no more of a work may be taken than is necessary to make any accompanying comment understandable. With respect to unpublished materials, the amount of copied material must comprise only a very small percentage of the copyrighted works both from a quantitative and a qualitative standpoint.

iii. The prior postings by defendant Erlich that form the basis of this order do not qualify as fair use primarily because of the quantity of the material posted and the very limited transformative use made of those materials. Identical or similar postings are therefore enjoined.

b. From destroying, altering, concealing or removing from the district in which defendant Erlich resides, any reproduction, copy, facsimile, excerpt or derivative of any work of L. Ron Hubbard that is described in Exhibit A or B including all such works returned pursuant to this order. Defendant Erlich or his counsel shall safely retain possession of any such items.

c. A condition of this preliminary injunction is that a $25,000 bond shall be posted (or continued in place) pursuant to Federal Rule of Civil Procedure 65(c).

2. Plaintiffs' application to expand the TRO is denied without prejudice.

3. Plaintiffs' motion for a finding of contempt against defendant Erlich is denied.

4. Plaintiffs are ordered to return within ten (10) days of the date of this order to defendant Erlich through his counsel all items seized pursuant to the writ of seizure issued February 10, 1995.

5. Plaintiffs' request for sanctions against defendant Erlich's counsel, Ms. Carla Oakley, is denied.